1194

John SAVARESE and Edward Flaxman

v.

William AGRISS; Donald Bogen; Thomas Bonser; Martha Kitchen; Wayne Mazur; John Neff; Monroe County Transportation Authority; James E. Cadue; Thomas Joyce; Marc R. Wolfe.

Appeal of William AGRISS, Donald Bogen, Thomas Bonser, Martha Kitchen, Wayne Mazur, John Neff, Monroe County Transportation Authority and Marc R. Wolfe, Appellants in Nos. 88–5671, 89–5057, 89–5006.

John SAVARESE and Edward Flaxman, Appellants in No. 89–5058,

v.

William AGRISS; Donald Bogen; Thomas Bonser; Martha Kitchen; Wayne Mazur; John Neff; Monroe County Transportation Authority; James E. Cadue; Thomas Joyce; Marc R. Wolfe; County of Monroe.

Nos. 88–5671, 89–5006, 89–5057 and 89–5058.

United States Court of Appeals, Third Circuit.

Argued June 13, 1989.

Decided Aug. 31, 1989.

As Amended Sept. 20, 1989.

Rehearing and Rehearing In Banc Denied Sept. 29, 1989.

Joseph E. Gallagher (argued), Bour, Gallagher, Foley, Cognetti, Cowley & Douglass, Scranton, Pa., for all appellants-cross appellees.

Zygmunt R. Bialkowski, Jr. (argued), Bialkowski & Savitsky, Scranton, Pa., for appellant-cross appellee, Marc R. Wolfe.

James A. Swetz (argued), Cramer, Swetz & McManus, Stroudsburg, Pa., for appellants-cross appellees Agriss, Bogen, Bon-

ser, Kitchen, Mazur, Neff, Monroe County Transp. Authority and Wolfe.

Cletus P. Lyman (argued), Lyman & Ash, Philadelphia, Pa., for appellees-cross appellants.

Before SLOVITER, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This action, filed pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343, was brought by John Savarese and Edward Flaxman against their former employer, the Monroe County Transportation Authority ("MCTA").[1] The defendants include the MCTA, six out of seven members of the MCTA's Board of Directors (including William Agriss, Dan Bogen, Thomas Bonser, Martha Kitchen, Wayne Mazur and John Neff), the County of Monroe, two of the three commissioners of Monroe County (including James Cadue and Thomas Joyce) and the solicitor of the MCTA (Marc Wolfe). App. at 154. The plaintiffs alleged a deprivation of certain rights under the first and fourteenth amendments of the United States Constitution. Specifically, they alleged the defendants fired them based on their political beliefs and in retaliation for a legal action filed by Savarese against various defendants.

Because we determine that the district court properly admitted certain statements which defendants allege are hearsay, we will affirm the liability portion of the judgment in favor of the plaintiffs. However, because we determine that the district court's orders regarding various damage awards were erroneous, we will reverse those portions of the judgment.

## I.

The Monroe County Transportation Authority was established in 1979 and Sa-

varese was appointed its first director. Edward Flaxman was the controller of MCTA. T.T. at 472. He became an employee of MCTA on June 15, 1984. At the time of his appointment, Savarese was a registered Republican and he has remained a Republican throughout this litigation. The members of the Board of the MCTA ("members") were all appointed by the County Commissioners. T.T. at 1485. From the beginning of Savarese's employment as executive director of the MCTA until January, 1984, the Republican party was the controlling party in the county. Two of the three county commissioners were elected on the Republican party ticket.[2] Under the direction of Savarese, the MCTA grew to a point where it had thirty-three employees; operated eighteen buses; and had a budget in excess of $1 million. App. at 214.

In 1983, a number of members of MCTA discussed with Savarese the idea of granting him a contract which would guarantee his employment for a number of years. As a result of those discussions, the members of the MCTA voted unanimously to grant Savarese a five-year contract of employment as executive director, which he accepted. As a result of the election of November, 1983, defendants Cadue and Joyce, members of the Democratic party, comprised the majority of the Board of County Commissioners, effective January 1984. Savarese alleges that after the November election, however, Mazur, Wolfe and the Democratic commissioners conducted a campaign to drive him from his employment as executive director. According to Savarese, part of this campaign included delaying the execution of the written employment contract, and asking Savarese to withdraw his "request" for an employment contract. App. at 8.

Over a period of time, the new Democratic majority replaced all of the members of the MCTA with people who had either so-

---

**1.** Plaintiffs Savarese and Flaxman agreed to drop Monroe County as a defendant with regard to the claim that the County deprived them of a fair hearing. This claim is discussed *infra*.

On August 12, 1987, the plaintiffs filed a notice of release indicating that they have settled

with defendants Cadue, Joyce and the County of Monroe. Rec.Doc. No. 152.

**2.** Defendant Marc Wolfe served as campaign manager for defendant Cadue who was elected as commissioner.

cial, political or business associations with the majority commissioners and were registered Democrats. In June, 1985, defendant Bogen became the chairman of the MCTA. Within one year, however, Bogen died. During this same period of time, Bogen suggested to Savarese and his wife that it would be wise if they changed their registration from the Republican to the Democratic party. App. at 456. Savarese's wife, thinking that it would stabilize her husband's position, changed her registration to the Democratic Party. Savarese, however, did not do so.

Although the prior Board felt strongly that Savarese should be given a contract of employment, Bogen indicated that the new commissioners would not offer Savarese such a contract. Savarese was requested to withdraw his request for a contract and he did so. He, therefore, remained in the position of Executive Director without a contract and as employee at will.

At approximately the same time, the MCTA was considering buying a fifteen-acre property known as the "Oak Street site" which was ultimately purchased by Savarese's father-in-law. The purchase resulted in speculation that there may have been some impropriety involving Savarese. Board member Bogen, in an interview with a local newspaper, indicated that Savarese had acted improperly by allegedly serving the interests of his father-in-law rather than the interests of the MCTA by providing his father-in-law confidential information that the Oak Street site was for sale. T.T. at 146–47 [3] Savarese then filed a libel action against Bogen, among others.[4] In the course of this dispute, Bogen made a public statement that there was no longer "room for the two of us" at the MCTA. He felt that Savarese would have to leave as a result of the lawsuit. Also, on the day

following the filing of the libel action, an emergency meeting was called by the Board and it voted to suspend both Savarese and Flaxman.

After the controversy concerning the Oak Street site, the County Commissioners instituted an investigation of Savarese through their county solicitor.[5] At least one Board member—namely, defendant Mazur—met with an MCTA employee and received from her several invoices which allegedly indicated improprieties on the part of Savarese. Mazur, in a telephone call to Flaxman, sought to enlist the aid of Flaxman in securing additional information against Savarese. He indicated that, in exchange for Flaxman's cooperation, Flaxman would be considered as a replacement for Savarese. T.T. at 483. Flaxman, however, refused to assist. Consequently, on October 18, 1985, Flaxman was orally suspended and this suspension was later confirmed by letter the same day. T.T. at 485. On October 22, 1985, the MCTA allegedly caused a report to appear in a local paper stating that the MCTA had suspended Flaxman pending an investigation into allegations of financial improprieties.

On October 25, 1985, the MCTA sent Flaxman a letter notifying him that a hearing would be held on November 12, 1985 concerning his job status. Savarese's hearing was scheduled for the same evening. T.T. at 178. However, Savarese did not receive the statement of charges against him until Friday, November 8. Since this was a holiday weekend, it was nearly impossible for Savarese to obtain access to records or to properly meet with witnesses to prepare for the Tuesday hearing. Despite his requests for a continuance, Savarese was forced to proceed. On November 13, 1985, the directors fired Savarese.[6] In light of the way Savarese's hearing was

---

**3.** An article appeared in the *Pocono Record* on Wednesday, September 18, 1985 entitled "MCTA to Discuss Land Buy by Director's In–Law." The article attributed the statement of the purpose of the meeting—namely to discuss a possible conflict of interest—to Bogen. Trial Transcript ("T.T.") at 140, 145.

**4.** The libel action, to this date, remains dormant. *See* Appellant's Brief at 13 n. 6.

**5.** Although the investigation was conducted through an independent investigative service, reports were made directly to the county solicitor.

**6.** Bogen did not cast an official vote.

handled, Flaxman refused to attend his own hearing. The hearing proceeded without him, however, and he was also terminated. The MCTA also caused an article to appear in the same local paper stating that Flaxman had been terminated for mishandling MCTA funds and records.

The plaintiffs, in their complaint, sought legal and equitable relief. Savarese made three claims against the defendants: (1) that his termination was caused by his affiliation with the Republican Party and hence violated the First Amendment; (2) that his suspension and termination was caused by the fact that he brought a libel action against the Chairman of the Board, Dan Bogen, and several other parties and thus violated the First Amendment; and (3) that the procedures used by the MCTA to terminate him violated his due process rights. App. at 155. Flaxman claimed that the defendants deprived him of a liberty interest in his good name and reputation without due process of law and that his first amendment rights were violated by defendants' political firings. App. at 162. In an amended complaint Savarese requested reinstatement with back pay, compensatory damages, punitive damages, costs and attorneys fees. App. at 13. Flaxman requested compensatory damages, punitive damages, costs and attorneys fees. App. at 16.

The claims for legal relief were presented to a jury while the equitable claims were decided by the district judge following the rendering of the jury verdict. After a thirteen-day trial, the jury returned a verdict for plaintiffs.[7] Because the judge wanted time to review the issue of punitive damages, the jury was recessed rather than discharged. App. at 191.

On June 17, 1987, following the reconvening of the jury for determination of the issue of punitive damages, the jury rendered a verdict in favor of the defendants.

On July 1, 1987, the plaintiffs served five motions: to add interest to the verdict; for a new trial on compensatory damages for Savarese; for a new trial on punitive damages; for equitable relief, including reinstatement with back pay and expungement of personnel files; and for attorneys fees and litigation expenses. The court denied Savarese's motion for a new trial on the issue of compensatory damages. The plaintiffs' motion for a new trial on the issue of punitive damages was also denied. In an opinion an order entered June 8, 1988, the district court also denied the defendants' motion for judgment NOV and a new trial.

In its order of July 6, 1988, the district court, considering itself bound by the jury's factual determinations in deciding

7. The jury responded to the special interrogatories as follows:

1. Did the Plaintiff John Savarese prove by the fair weight and preponderance of the evidence that his affiliation with the Republican Party was a substantial factor in his suspension and termination from his job as Executive Director?
[JURY'S RESPONSE: YES as to all defendants but Kitchen and the County of Monroe.]
2. Did the Plaintiff John Savarese prove by the fair weight and preponderance of the evidence that his bringing a libel action in the Court of Common Pleas of Monroe County against Dan Bogen, Chairman of the Board of MCTA and certain other persons, was a substantial factor in bringing out [sic] his suspension and termination from his job as Executive Director?
[JURY'S RESPONSE: YES as to all defendants.]
3. Did the Plaintiff John Savarese prove by the fair weight and preponderance of the evidence that the members of the Board of Di-

rectors of the MCTA deprived him of due process and a fair hearing on the charges against him?
[JURY'S RESPONSE: YES as to all defendants (Monroe County was dropped with respect to this claim.)]
4. Calculate the amount of damages, if any, sustained by the Plaintiff John Savarese as a result of the actions of the Defendants.
[JURY'S RESPONSE: $103,400.00.]
5. Did the Plaintiff Edward Flaxman prove by the fair weight and preponderance of the evidence that his refusal to become an accomplice in an effort to terminate John Savarese was a substantial factor in bringing about his suspension and termination from his position with the MCTA?
[JURY'S RESPONSE: YES as to all defendants.]
6. Calculate the amount of damages, if any, sustained by the Plaintiff Edward Flaxman as a result of the actions of the Defendants.
[JURY'S RESPONSE: $75,600.00.]
App. at 194–99.

that the plaintiffs had been impermissibly fired from their positions, ordered the plaintiffs to be reinstated. The court also granted plaintiffs' request for back wages, and ordered that the defendants pay the plaintiffs wages and benefits for the period from June 5, 1987 through July 20, 1988 "at levels equal [to] the wages and benefits they were receiving at the time of their suspension, increased to allow for any raises or changes in benefits which have accrued to similar employees since the date of their suspension from duties." Rec.Doc. No. 196. Additionally, the Court ordered the expungement of the plaintiffs' records concerning their discharge as the jury had found that the hearings accompanying the discharges violated plaintiffs' due process rights. *Id.*

In an order dated July 7, 1988, the court awarded the plaintiffs attorneys' fees. On July 20, 1988, the MCTA offered to reinstate Savarese if he produced a certificate stating that he had recovered from the emotional illness caused by his firing. Flaxman was reinstated on July 21, 1988; however, Savarese was not reinstated due to his inability to produce the certificate. On August 17, 1988, the plaintiffs moved to enjoin the pending state court action taken against them to recover allegedly misappropriated funds. On August 18, 1988, the back pay award was stayed pending appeal.

On August 23, 1988, the defendants appealed the award of attorneys fees (Appeal No. 88–5671). On September 9, 1988, the court awarded plaintiffs $5,966.07 as damages for delay pursuant to Pennsylvania Rule of Civil Procedure 238.

On November 18, 1988, the court held a hearing on the amount of back pay and benefits to be awarded pursuant to the July 6, 1988 order as the parties were unable to agree on the amount. The court, on December 9, 1988, issued three memoranda and orders: (1) denying Savarese's request for reinstatement; (2) denying plaintiffs' motion to enjoin the state court actions; and (3) awarding Savarese $44,631.23 and Flaxman $31,191.06 in lost wages and benefits. *See* Rec.Doc. Nos. 290–92. Judgment was entered on December 12, 1988 and the defendants appealed and the plaintiffs cross-appealed. We have jurisdiction of this appeal based on 28 U.S.C. § 1291.

## II.

## DISCUSSION

### A. *The Admissibility of Bogen's Statements*

The defendants have challenged the admission of a series of statements made by the MCTA chairman, Bogen, during the period from April, 1983 to October, 1985.[8]

---

8. The defendants request a new trial based on the alleged improper admission into evidence of numerous statements including the following:

a. "He [Bogen] told me [John Savarese] that he wanted to run for chairman, that he believed he controlled the majority votes on the board of directors and that he could win an election." T.T. at 113.

b. "Well, Dan Bogen came into my [John Savarese's] office and asked to see the applications and pulled Melody Fariley's application out, gave it to Ed Flazman [sic] and told him this is the one we're hiring. She is from the courthouse." T.T. at 120.

c. "Dan Bogen instructed us [John Savarese] to hire Ceil [Kashinski]." T.T. at 121.

d. "He [Bogen] told me [John Savarese] I had to go to Mr. Cadue's office with him. I had to accompany him to Mr. Cadue's office." T.T. at 126.

e. "He [Bogen] told me [John Savarese] he was ordered to do it [concerning the articles in *The Pocono Record* of September 18, 19, 1985] to be

reappointed to the board of directors of the MCTA and we had a lengthy discussion over whether it was worth it or not." T.T. at 151–52.

f. "[H]e [Bogen] had just met with one or more members or commissioners of Monroe County and he indicated to me [Bear] that he had some pressure placed upon him to terminate the services of John Savarese as executive director of the authority...." T.T. at 193.

g. "He [Bogen] indicated to me [Bear] that it was a condition on his reappointment that Mr. Savarese be terminated from his position." T.T. at 194.

h. Question: "Did Mr. Bogen say what the consequences would be if you didn't reject the contract from authority [sic]?" Answer: "That I [John Savarese] would be immediately terminated." T.T. at 325.

i. "He [Bogen] was telling me [John Savarese] I would be terminated, that the commissioners were demanding that." T.T. at 326.

j. "He [Bogen] had told me [John Savarese] I had to say to the commissioners that I was withdrawing any request I had with the authori-

Defendants argue that "[t]he flaw in such testimony is that it was hearsay, the declarant Bogen being deceased at the time of trial." Appellant's Brief at 9.

■ We generally review trial rulings concerning the admission of evidence under the "abuse of discretion" standard. *See In re Japanese Electronic Products,* 723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds, sub nom Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, when "rulings on admissibility of evidence call for the application of a legally set standard ... our review is plenary." *Id.* at 257. Accordingly, we exercise plenary review over the district court's determination that the statements are admissible under Fed.R.Evid. 801(d)(2)(A). Because we agree that Bogen's statements are admissible as the statements of a party opponent, we hold that the district judge did not err in admitting these statements.

■ At the outset, we note that Bogen was a party to this action in his official capacity despite the fact that he was deceased at the time of trial.[9] Rule 801(d), which plaintiffs argue applies to Bogen's statements, provides:

ty for the contract ... [a]nd I was told that I had to tell that to the commissioners at this meeting." T.T. at 328.

k. "He [Bogen] told me [John Savarese] I could not go [to Europe]. This was after he became chairman of the authority. He told me I could not go, that it [sic] he felt it would be a conflict of interest for me to go, and I would have to reject the trip." T.T. at 330.

l. "He [Bogen] told me that he couldn't understand why Cadue was giving him such a hard time, that he was doing everything—" T.T. at 333.

m. "Well, he [Bogen] couldn't understand why he was getting treated the way he was." T.T. at 334.

n. "He [Bogen] said to me, John [Savarese], you got to understand it's what I have to do. They're forcing me." T.T. at 335.

o. "Dan Bogen was having a conversation with John. And he kind of switched the conversation. He said to John, you know, you're going to have to change your party. It's very important for you to change over to the democratic party. This means your employment and its very important." T.T. at 456.

Statements which are not hearsay. A statement is not hearsay if—

. . . .

(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity. . . .

Fed.R.Evid. 801(d)(2)(A).[10]

The defendants argued during oral argument that admission of these statements is not supported by the theory underlying the admission into evidence of admissions, namely, their inherent reliability. The Advisory Committee Notes state that "[n]o guarantee of trustworthiness is required in the case of an admission." Fed.R.Evid. 801(d)(2). In support of their position, the defendants cited during oral argument the Advisory Committee's statement that "[a]dmissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the *result of the adversary system* rather than satisfaction of the conditions of the hearsay rule." *Id* (emphasis added). They argue that since Bogen is now deceased, the admission into evidence of his statements is not justified as it cannot be accomplished within an "adversary" context.

p. "Dan did come over to me [Linda Savarese] and he said—he just said that he did what he had to do." T.T. at 469.

9. It makes no difference whether the statement was actually made while Bogen was acting as an official at the time he made the statement. *See* Fed.R.Evid. 801(d)(2)(A) Advisory Committee Notes ("if [the declarant] has a representative capacity and the statement is offered against him in that capacity, no inquiry whether he was acting in the representative capacity in making the statement is required; the statement need only be relevant to represent [sic] affairs").

10. Appellees correctly conclude that the Pennsylvania Dead Man's Statute would not apply to this federal claim. *See* Appellees' Brief at 25; *see also, Longoria v. Wilson,* 730 F.2d 300 (5th Cir.1984) (refusing to apply the Texas Dead Man's Statute in a section 1983 claim); *Donaldson v. Hovanec,* 473 F.Supp. 602 (E.D.Pa.1979) (in a civil rights action, the Pennsylvania Dead Man's Act does not apply).

However, we also note that the Advisory Committee called for "generous treatment to this avenue of admissibility." *Id.* Moreover, the Advisory Committee Notes to Fed.R.Evid. 804(b)(3) suggest that a deceased party's statement will be admissible under Fed.R.Evid. 801(d)(2) as the Notes state that, "[i]f the statement is that of a party, offered by his opponent, it comes in as an admission [under Rule 801(d)(2) ] and there is no occasion to inquire whether it is against interest, this not being a condition precedent to admissibility of admissions by opponents." Since unavailability of the declarant is a prerequisite to admissibility under Rule 804, it follows that the Advisory Committee must have contemplated cases in which a *party* is no longer available. *See also* J. Wigmore, IV Wigmore on Evidence § 1049 at 8 (1972) (subheading entitled, "Admissions, distinguished from the hearsay exception for statements of facts against interest; *death not necessary.*") (emphasis added).

Although this is an issue of first impression in this Court, we have, on a prior occasion, suggested that an admission by a party-opponent may be admissible when the party is deceased at the time of trial. In *Pollack v. Metropolitan Life Ins. Co.,* 138 F.2d 123 (3d Cir.1943), we stated:

'The statements made out of court by a party-opponent are universally deemed admissible when offered against him.' While it is true that statements are extra-judicial, and technically hearsay, since the witness offers the statement of another as proof of the fact alleged in the statement, yet since the statement is that of the party himself, he can hardly be heard to complain that he cannot cross-examine himself as to his own utterances. The rule is well settled, of course, that for an admission to be available as evidence against a party the declarant need not be dead or otherwise unavailable.

*Id.* at 125 (quoting 4 Wigmore on Evidence § 1048 (3d Ed.1940)) (footnotes omitted). If a declarant "need not be dead," it logically follows that the declarant *could* be dead. *See also United States v. Young,* 736 F.2d 565, 569 (10th Cir.1983) ("[i]n a case with facts similar to this, it was held that statements made by a witness who died prior to trial would be admissible under Rule 801(d)(2)(A) [pertaining to admissions by a party opponent], (B), and (E)"). Further, we note that several courts have held that a statement by a declarant, deceased at the time of trial, may be admissible under the vicarious admission provision in Fed.R.Evid. 801(d)(2)(D). *See, e.g., Pino v. Protection Maritime Ins. Co.,* 599 F.2d 10, 13 (1st Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); *Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n,* 551 F.2d 1136, 1138 (8th Cir.1977). We believe the better view is that the fact of the declarant's death impacts on the weight of the evidence rather than its admissibility. *See* J. Wigmore, *Wigmore on Evidence* §§ 1055, 1056 at 23 (1972) (acknowledging in a subheading entitled, "Weight of Admissions," that "there is a general distrust of testimony reporting any extrajudicial *oral statements* alleged to have been made, including a party's admissions.") (footnote omitted) (emphasis in original). Accordingly, we will affirm the district court's ruling on the admissibility of the challenged statements.

### B. *Punitive Damages*

The plaintiffs assert several grounds on appeal as bases for their claim that they are entitled to a new trial on the issue of punitive damages, including the argument that the district court improperly charged the jury. Because the district court's instructions on punitive damages were ambiguous as to the correct legal standard the jury was to apply, we will vacate this portion of the judgment, and do not find it necessary to discuss the other alleged grounds for reversal.

On June 9, 1987, plaintiffs requested the court to charge the jury in accordance with *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). The court reconvened on June 16, 1987 and charged the

jury on punitive damages. T.T. at 1829.[11] Following the charge, plaintiffs' counsel objected on the ground that the charge imposed a higher and more difficult standard than that required by *Wade*.[12]

■ Generally, "[t]he standard of review for the district court's ruling on points for charge is ... abuse of discretion." *Link v. Mercedes–Benz of N.Am.*, 788 F.2d 918, 922 (3d Cir.1986). Jury instructions are considered as a whole to determine wheth-

er they are misleading or inadequate. However, the question of whether a jury instruction misstates a legal standard is a question over which we have plenary review. *See United States v. Douglass*, 780 F.2d 1472, 1475 (9th Cir.1986); *United States v. Adams*, 759 F.2d 1099, 1115–16 (3d Cir.), *cert. denied, Alongi v. United States*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985), and *cert. denied, Adams v. United States*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985).[13]

**11.** Plaintiffs did not seek punitive damages against the MCTA or the County of Monroe. T.T. at 1837.

**12.** In objecting to the charge, plaintiffs' counsel stated:

Your honor, the standards that you gave the jury appear to me to be higher standards for the Plaintiffs to meet than Smith v. Wade, which is the controlling case which says that the jury may be permitted to assess punitive damages in 1983 actions when the Defendant's conduct involves reckless and callous indifference to the Plaintiffs Federally protected rights as well when it is motivated by evil intent.

T.T. at 1894.

**13.** The main portion of the jury instruction is as follows:

The Plaintiffs in this case, however, are seeking what we call punitive of damages [sic] and is [sic] entitled to have a hearing before you to *determine* whether the Plaintiffs, both of them, are entitled to have a hearing to determine whether or not, in your judgment, they have proved, by the fair weight and preponderance of the evidence, that they are entitled to something more than the damages that you have awarded them; or whether, in your judgment, they have proved, by the fair weight and preponderance of the evidence, that the Defendants in this case should be punished for what they have done or should be burdened with an additional cost to deter not only them, but others from perhaps engaging in similar conduct.

That's, essentially, what this part of this case is about, Members of the Jury.

. . . .

I want to tell you that you have to base the judgments and the decisions that you make in this case solely on the evidence and the testimony that you heard.

. . . .

You weigh the way the testimony again [sic]. And in order for the Plaintiffs to be awarded any further damages in this case, you must find that they have proved, by the fair weight and preponderance of the evidence, that the Defendants have engaged in conduct that was so outrageous, so *vicious*, so

*intentionally* harmful that they should be punished for that conduct.

. . . .

The law says, Members of the Jury, then, I will tell, that you the function of punitive damages, the reason why a jury would award punitive damages in any way case or assess punitive damages, I guess is a better word, against the Defendants because really punitive damages is not an award that essentially goes to the Plaintiffs in any case because of some right to those damages that they have.

But, rather, it's an assessment of damages against the Defendants because their conduct was so *vicious*, so *intentionally* harmful, that money damage, if it's awarded, does, in fact, go to the Plaintiffs in a given case, because that's what the law is. But it's really a type of damage that's awarded not on the basis of any loss as such that the plaintiffs have suffered. You've already awarded them that in the damage award that you made to them before, but this type of a damage award is made because you feel, as a jury, that you should assess a penalty, a punishment against the Defendants in addition to the one you have already awarded.

And you must find that you do that because of what you find—because you find, rather, that the testimony convinces you they acted intentionally, or recklessly, or in complete disregard of the rights of other people in this case, namely, the Plaintiffs, Mr. Savarese and Mr. Flaxman.

The law says, Members of the Jury, that the sole function of punitive damage is to deter and to punish egregious behavior.

Egregious behavior is considered to be flagrant, *vicious* behavior of one person against another, knowing that at the time you commit that act you were violating some specific rights that that Plaintiff has.

You often think, Members of the Jury, as an example, of the difference between negligent behavior and *flagrant, violent, intentional* behavior if a person is driving a car down the street and his attention is called or he lets his attention slide to looking at the view along the mountain side as he drives and misses seeing a stop sign and causes an accident. Then that would be negligent behavior.

We find that at various points the judge's instruction erroneously required a higher standard for the award of punitive damages than that set forth in *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). In *Wade*, the United States Supreme Court held that a jury may impose punitive damages against defen- dants in a section 1983 case for conduct which demonstrates a reckless or callous disregard of, or indifference to, the rights or safety of others. *Id.* at 56, 103 S.Ct. at 1640.

The jury instruction given by the trial judge in *Wade*—which the United States

> But if the same person came upon an area where there was a school yard and small children, and in spite of his knowing that the children were there, he would close his eyes deliberately and deliberately run his car through that area. Then that would be egre- gious, flagrant behavior as opposed to mere negligent behavior.
>
> You cannot award punitive damages against Defendants merely because they were negli- gent, or because they failed to live up to due care in their relationship with other parties, or because they violated a contract with an- other party. You cannot award punitive dam- age for that type of conduct. For that type of conduct, you award compensatory damages. The damages that injured party actually suf- fers.
>
> *But if you find, in addition to the negligent or careless behavior, that there was reckless, vicious, intentional, deliberate, harmful con- duct, almost like criminal type of conduct, then the law says you can award or assess against those Defendants a punitive award of damages which you think, under the circum- stances of the case, is just in the amount and in the factor that the Defendants should be punished for their conduct.*
>
> The law says then, Members of the Jury, that in ruling upon the question of whether or not punitive damages should be assessed that you, the jury, should consider the nature of the wrongdoer's or the Defendants' act itself. You should consider the motives of the Defen- dants. You should consider the relationship between the parties, the Plaintiffs and the Defendants. And you should consider all of the circumstances under which these parties were acting together or in which they were involved.
>
> In this case, you know that this case is all about what we call a civil rights claim, where the Plaintiffs in this case were employees and their allegations were that they were dis- missed or removed or fired from their jobs because of improper motives, namely, the fil- ing of a lawsuit, the registration in one politi- cal party and the failure to join in conduct to arrange for the firing of another party.
>
> The law goes on then, Members of the Jury, to say that punitive damages can be awarded only for conduct for which this special type of remedy is appropriate in the jury's mind, that is to say, that you award this kind of damages only when the conduct involves some element of outrage, similar to that usually found in crime.
>
> The conduct, in order for it to require the assessment of punitive damage, the law says, must be outrageous either because the Defen- dants' acts are done with an *evil intent*, or because they are done with reckless indiffer- ence to the rights of the Plaintiffs in this particular case.
>
> Punitive damages, the law says, Members of the Jury, and I so instruct you, that punitive damages are not to be award [sic] for mere inadvertence, or because someone made a mistake, or because somebody used bad judg- ment, or because someone was negligent and because their actions constituted a violation of another's rights.
>
> And they're not to be permitted or granted for a breach of a contract. They are to be awarded only in those special situations where the jury finds that, in addition to that type of conduct, the Defendants were *inten- tionally* outrageous in their conduct and had an *evil motive* and proceeded against the Plaintiffs in disregard for any rights that those Plaintiffs have in regard to their rela- tionship that they had with each other. And here it was an employer-employee relation- ship.
>
> The law in this Circuit, Members of the Jury, has been held to be that the test that you, the jury, use in deciding whether or not to award punitive damages, whether you find that the Defendants acted with actual knowl- edge, that at the time they were acting that they were violating a Federally protected right of the Plaintiffs, and that they moved ahead either *intentionally* to violate that right or in total reckless disregard of whether they would violate the Plaintiffs Federal rights or not.
>
> The law that is followed in this Circuit and the law that governs this case, Members of the Jury, again is summarized as follows.
>
> Punitive damages may be awarded for con- duct that is outrageous because of Defendants' *evil motive*, or his reckless indifference to the rights of others.
>
> . . . .
>
> You have to consider all of those factors, how they interrelated with each other, what their relationship was, what it should have been, and how they acted in this case, and how Mr. Savarese and how Mr. Flaxman act- ed within the employment scope that they were responsible for as employees of this au- thority.
>
> T.T. at 1879–87.

Supreme Court ultimately approved—was, in relevant part:

> If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be *a reckless or callous disregard of, or indifference to, the rights or safety of others,* then you may assess punitive or exemplary damages in addition to any award of actual damages.

461 U.S. at 33, 103 S.Ct. at 1628 (emphasis added by Supreme Court). The petitioner in *Wade* was charged with a section 1983 violation, and had argued that the proper test for an award of punitive damages is one of actual intent—"ill will, spite, or intent to injure." 461 U.S. at 37, 103 S.Ct. at 1630. The Supreme Court, however, specifically rejected the proposed actual intent standard after surveying the common law from the time of section 1983's predecessor statute, the Civil Rights Act of 1871. In the course of examining state law, the Court noted that:

> Most cases under state common law, although varying in their precise terminology, have adopted more or less the same rule, recognizing that punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others or even gross negligence.

461 U.S. at 48–49, 103 S.Ct. at 1636. In addressing whether or not the same standard applies in a section 1983 context, the Court stated that "we discern no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action." 461 U.S. at 48–49, 103 S.Ct. at 1636. Accordingly, the Court held that "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages." 461 U.S. at 51, 103 S.Ct. at 1651.

■ Thus, for a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard. This point is made clear by the Supreme Court's language in *Wade:* "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, *or* when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640 (emphasis added). *See also id.* at 46–47, 103 S.Ct. at 1635–36 (quoting disjunctively stated standards in Restatement (Second) of Torts § 908(2) (1979)).

■ Our principal difficulty with the jury charge on punitive damages in this case is that the district court presented the "reckless or callous disregard or indifference" standard as well as the higher "evil, intentional" standard, disjunctively in some instances and conjunctively in others. For example, the court at one point correctly instructed, "And you must find that ... the testimony convinces you [the defendants] acted intentionally, *or* recklessly, *or* in complete disregard of the rights of other people in this case, namely, the Plaintiffs...." T.T. at 1882 (emphasis added). Similarly, the court also charged: "The conduct, in order for it to require the assessment of punitive damage, the law says, must be outrageous *either* because the Defendants' acts are done with an evil intent, *or* because they are done with reckless indifference to the rights of the Plaintiffs in this particular case." *Id.* at 1885 (emphasis added).[14]

In another instance, however, the court's instruction may have confused the jury, by directing, "[I]n order for the Plaintiffs to be awarded any further damages in this case, you must find that they have proved by the fair weight and the preponderance

---

14. Use of the word "require" in this context was not correct. An award of punitive damages is discretionary with the jury and is not "required"

even if the defendant's conduct is intentional. *See* Restatement (Second) of Torts § 908 comment d (1979).

of the evidence, that the Defendants have engaged in conduct that was so outrageous, so vicious, so intentionally harmful that they should be punished for that conduct." *Id.* at 1880–81. Likewise, the court also stated that the jury could award punitive damages where it found that "in *addition* to the negligent or careless behavior, that there was reckless, vicious, intentional, deliberate, harmful conduct, almost like criminal conduct...." *Id.* at 1884 (emphasis added).

A review of the entire jury charge thus leads us to conclude that the jury was given an ambiguous statement of punitive damages liability. The jury may have been led erroneously to believe from the numerous references in the instructions that in order to award punitive damages it was required to find that the defendants' conduct was "intentional," "vicious," "deliberate," and "evil," a standard which exceeds that of "recklessness" which the Supreme Court held was an alternative basis for an award. Accordingly, we will vacate the judgment in the punitive damages aspect of the case and remand for a new trial.

 We note, however, that our decision here leaves undisturbed this Court's view that punitive damages in general represent a limited remedy, to be reserved for special circumstances. *See Cochetti v. Desmond*, 572 F.2d 102, 105–06 (3d Cir.1978).[15]

## C. Compensatory Damages

 The jury awarded compensatory damages to Savarese in the amount of $103,400.00 and to Flaxman in the amount of $75,600.00.[16] Savarese presents two arguments as possible bases for vacating his compensatory damage award. First he argues that the award was inadequate because he presented evidence to the jury showing lost wages and fringe benefits in the amount of $58,209.00 and future medical expenses ranging from $43,750.00 to $63,000.00. He states that Flaxman, by comparison, presented lost wage and economic claims amounting to $3,300.00 and moving expenses of approximately $5,000.00.[17]

Our review of a damage award is "exceedingly narrow." *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030, 1038 (3d Cir.1987) (quoting *Walters v. Mintec/International,* 758 F.2d 73, 80 (3d Cir. 1985)). In *Williams,* we stated that we would grant a new trial " 'only if the verdict is 'so grossly excessive as to shock the judicial conscience." " *Id.* (citations omitted). The same standard applies to awards challenged for inadequacy. Because we do not find the award in this case "shocking," we reject this challenge as the jury is free to refuse to credit all of Savarese's testimony.

 Second, Savarese argues that the award of compensatory damages should be vacated by this Court and that the award should be recalculated. Based on his citation of *Greminger v. Seaborne,* 584 F.2d 275 (8th Cir.1978), Savarese apparently believes that it is unclear how much of the award was for front pay and that the front and back pay awards may overlap. Appellees' Reply Brief at 15–16. Savarese argues that the district court should recalculate the amount of back pay and let the jury determine the length of time for which Savarese should receive front pay. He believes he was undercompensated for the "emotional injuries" he sustained. *See* Appellees' Reply Brief at 15–16. Conversely, the defendants appeal the equitable award of back pay, alleging that the jury may have awarded front pay in its compensatory damage award, resulting in possible

---

15. Because this matter must be retried, we note that although defendant Bogen was deceased at the time of trial, the question of his liability as to punitive damages was submitted to the jury. Punitive damages, however, are not generally awarded against a decedent. *Novak v. Callahan (In re GAC Corp.),* 681 F.2d 1295, 1301 & n. 5 (11th Cir.1982); *Barnes v. Smith,* 305 F.2d 226, 231 (10th Cir.1962). *See* Restatement (Second) of Torts § 908 comment a (1979).

16. In addition, Savarese received $44,631.23 in back pay and Flaxman received $31,191.06 in back pay, awarded by the court as equitable relief.

17. Flaxman does not appeal his award of compensatory damages.

double-counting or overlapping awards.[18] They maintain that it was error for the district court to grant an equitable award of back pay where the plaintiffs introduced evidence of future wage losses and where the judge instructed the jury that they may consider future wage losses as part of the damages. The district court's order of July 6, 1988, directed the Authority to pay back pay to each plaintiff for the period from June 5, 1987, the date following the verdict, to July 20, 1988. However, when instructing the jury on compensatory damages on June 5, 1987, the district judge instructed the jury that it may "look at the loss of earnings, if any, that you find from the both plaintiffs that were incurred as a result of the actions of the defendants in this case; and you can look at the future loss of earnings." App. at 164–65. It is apparent to us that the damage awards may have overlapped.

In *Wagle v. Murray,* 546 F.2d 1329, 1336 (9th Cir.1976), *vacated and remanded on other grounds,* 431 U.S. 935, 97 S.Ct. 2645, 53 L.Ed.2d 252 (1977), the Court of Appeals for the Ninth Circuit stated that if there is some doubt "whether the jury may have included back pay in calculating damages[,]" then "[i]t will be open to the trial court on remand to resolve this issue, and, if it appears that double recovery would otherwise result, to reduce either the award of damages or of back pay." *See also Greminger v. Seaborne,* 584 F.2d 275, 278 (8th Cir.1978) ("to the extent the sums granted included lost earnings, plaintiffs would not be entitled to an overlapping award of back pay"). We choose to follow the direction the Courts of Appeals for the Eighth and Ninth Circuits have taken, and refuse to speculate as to the bases for the two awards. Accordingly, because we agree that the awards may overlap, we will vacate both Savarese's compensatory damage award and the equitable award of back pay for Savarese and remand to the district court for a new trial on compensatory damages and a recalculation of back pay by the district judge.[19]

### D. *Damages for Delay*

Following the verdict in their favor, the plaintiffs moved to recover from the defendants damages for delays in bringing the case to trial pursuant to Pennsylvania Rule of Civil Procedure 238. On September 9, 1988, the district court awarded Savarese

---

**18.** The defendants have not appealed the jury's award of compensatory damages. We note that the defendants would have had a heavy burden in light of the fact that they did not object to the trial judge's instruction to the jury that it could consider future loss of earnings in determining compensatory damages.

**19.** Arguably, defendants implicitly raise the point that Flaxman's award may present the problems of possible double counting when they say that "it is evident Appellees (at the very least Savarese) sought backpay and frontpay from the jury as a result of their firing." Appellant's Brief at 5b. Indeed, the jury was instructed that they may "look at the loss of earnings, if any, that you find from the *both plaintiffs* that were incurred as a result of the actions of the defendants in this case; and you can look at the future loss of earnings." App. at 164–65 (emphasis added). Flaxman earned no income for the fifty-eight weeks between June 5, 1987 through July 20, 1988. Flaxman, however, did not ask the jury for lost wages, front pay or prospective damages. On December 9, 1988, the district court awarded Flaxman pay and benefits for the fifty-eight week period between the jury verdict (June 5, 1987) and reinstatement (July 20, 1988). Based on the record before us, we do not find error in Flaxman's damage awards.

We address, for purposes of the district court's consideration on remand, the defendants' challenge to the award of back pay to Savarese. The defendants argue that the award was inappropriate if the employee could not have worked during the period in question. The Appellants cite no cases for this proposition. *See* Appellants' Brief at 6b. A back pay award should make whole the injured party by placing that individual in the position he would have been in but for the defendants' wrongful conduct. It would indeed be ironic if the plaintiffs were denied back pay because they were unable to work when the defendants' actions caused the disability. Accordingly, we reject the defendants' challenge based on the Supreme Court's recognition that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries *caused* by the deprivation of constitutional rights," *Carey v. Piphus,* 435 U.S. 247, 253–54, 98 S.Ct. 1042, 1046–47, 55 L.Ed.2d 252 (1978) (emphasis added), and that "Congress intended that awards under § 1983 should deter the deprivation of constitutional rights." 435 U.S. at 256, 98 S.Ct. at 1048.

and Flaxman a total of $5,966.07 in delay damages pursuant to Rule 238.

■ In briefing the issue, neither party questions whether Pennsylvania substantive law applies with regard to the determination of prejudgment interest, and both parties proceed on the assumption that it does apply. The parties devote much attention to the issue of which version of the Pennsylvania Rule applies.[20] However, the assumption that Pennsylvania law applies is contrary to our decision in *Poleto v. Consolidated Rail Corp.*, 826 F.2d 1270 (3d Cir.1987), where we held that "the availability of interest in an action arising under a federal statute is governed by federal law, not the law of the forum state." *Id.* at 1274 (citing *Carver v. Consolidated Rail Corp.*, 600 F.Supp. 125, 125–26 (E.D. Pa.1984)); *see also Garrick v. City and County of Denver*, 652 F.2d 969, 971 (10th Cir.1981) ("Federal standards govern the determination of damages under the federal civil rights statutes.") (citations omitted).[21] The plaintiffs in *Poleto* similarly urged this Court to apply Pennsylvania Rule of Civil Procedure 238 which allows prejudgment interest. 826 F.2d at 1274. We held that "[b]ecause [the plaintiff's] claim ... is predicated upon a violation of a federal statute, state substantive law, particularly Pennsylvania Rule of Civil Procedure 238, is not implicated." (citation omitted). Instead, we stated that "[a]ny claim to prejudgment interest must therefore be derived from federal statutory sources." 826 F.2d at 1274.

More particularly, this Court has on a prior occasion noted the importance of federal uniformity in awarding damages under section 1983. *See Basista v. Weir*, 340 F.2d 74 (3d Cir.1965). In *Basista*, we stated that:

> We believe that the benefits of the [Civil Rights] Acts were intended to be uniform throughout the United States, that the protection to the individual to be afforded by them was not intended by Congress to differ from state to state, and that the amount of damages to be recovered by the injured individual was not to vary because of the law of the state in which the federal court suit was brought. Federal common law must be applied to effect uniformity, otherwise the Civil Rights Acts would fail to effect the purposes and ends which Congress intended.

340 F.2d at 86. Consequently, our holding is consistent with our announced policy of striving for federal uniformity in the area of damages in civil rights cases.

While Pennsylvania law permits delay damages only for delay caused by the defendants, *see Craig v. Magee Memorial Rehab. Center*, 512 Pa. 60, 515 A.2d 1350 (Pa.1986)[22], we have stated that in federal question cases, an award of prejudgment interest "would generally be committed to the discretion of the district court." *Poleto*, 826 F.2d at 1279 n. 16.[23] Accordingly, because we find the district court erred in applying Pennsylvania law in awarding delay damages, we will vacate the award and

**20.** The method for calculating damages under Rule 238 changed twice during the course of the litigation. Because we hold that the Pennsylvania law is not applicable here, the issue of which version applies is not before us.

**21.** Were this Court sitting in diversity, Pennsylvania law would apply. *See Poleto*, 826 F.2d at 1274 n. 6 ("This is to be contrasted with the situation where federal jurisdiction is predicated upon diversity of citizenship; there, matters of prejudgment interest are considered substantive and are governed by state law.") (citing *Jarvis v. Johnson*, 668 F.2d 740, 746–47 (3d Cir. 1982)).

**22.** The Pennsylvania Supreme Court amended Rule 238, to provide among other changes, a

different method for computation of interest. The amendment took effect November 7, 1988.

**23.** We have recognized that delay caused by a party is a factor to be considered. *See Poleto*, 826 F.2d at 1279 n. 16 (recognizing that it may be appropriate to limit or even deny prejudgment interest where the plaintiff has been responsible for undue delay in prosecuting the lawsuit); *see also id.* at 1276 n. 10 (recognizing delay as a reason for awarding prejudgment interest as it tends to discourage defendants from "pursuing the tactical delay that prompts plaintiffs to settle on more favorable terms"—a rationale which we noted is "similar to that underlying Pennsylvania Rule of Civil Procedure 238."). Thus, the district court is free to consider delay as a factor on remand.

remand the issue to the district court for redetermination.

### E. *The Denial of the Injunction*

■ The plaintiffs filed a motion asking the district court to enjoin two state court actions instituted against the plaintiffs by the MCTA.[24] The plaintiffs based the motion on the argument that these actions should have been brought as compulsory counterclaims pursuant to Rule 13 of the Federal Rules of Civil Procedure. The plaintiffs argued further that 28 U.S.C. § 2283 authorizes federal courts to protect or to effectuate federal judgments and that a stay is the proper remedy to prevent relitigation of such claims.[25] They argue here that "[t]he trial court should have issued an injunction to bar relitigation of the compulsory counterclaim defendants failed to bring." Appellees' Brief at 49. Because of the nature of the state and federal claims, we reject the plaintiffs' arguments.

The district judge, in ruling on the motion, noted that the purpose of an injunction in such circumstances is to prevent relitigation in state courts of issues which the federal courts have fully and finally adjudicated. In denying the motion, the judge found that "the parties are not the same since many of the Defendants in the federal claim are not named parties at all in the state claims." *See* Appellee's Addendum E at 2. Secondly, he found that it was not necessary for the jury in the federal case to decide the issues upon which the defendants' claim are based in the state court actions. *Id.* Finally, the district judge concluded that:

> The Plaintiffs make a long argument to the effect that their victory here in the Federal Court signaled agreement with their argument that the Defendants carried out a long vendetta against them because of their political affiliation.

They argued, too, that this vendetta included many of the items referred to in the State Court action. While some of that may be accurate, nonetheless, the issues and the parties in the State Court actions are much different from what was at stake in the Federal Court action and thus, we decline to grant the motion to enjoin the State Court actions.

*Id.*

We agree that the state actions are sufficiently distinct so as to conclude that they are not the proper subjects for compulsory counterclaims under Fed.R.Civ.P. 13. In *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631 (3d Cir.1961), we stated that "a counterclaim is compulsory if it bears a 'logical relationship' to an opposing party's claim." *Id.* at 634 (citations omitted). We stated further that "a counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort...." 286 F.2d at 634. In the federal action, the cause of action is against not only the MCTA, but six of its members, its solicitor and two members of the Board of County Commissioners of Monroe County and it complains of a violation of federally protected interests. In the state action, the sole plaintiff is the MCTA. The other parties defending in the federal action are not involved in the state case. Consequently, there would be no substantial duplication of effort.

The elements of the claims are likewise distinct. On the one hand are federally protected interests of fundamental constitutionally protected rights and the alleged violation of those rights by unlawful termination from employment. On the other hand, the state action deals with funds and assets of the MCTA by which the plaintiffs were employed, as the MCTA's state court actions against the plaintiffs are for re-

---

**24.** These actions are entitled *MCTA v. Savarese,* filed in the Court of Common Pleas of Monroe County (CA 2639 1986) and *MCTA v. Flaxman,* filed in the Court of Common Pleas of Monroe County (CA 2640 1986).

**25.** Section 2283 provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
> 28 U.S.C. § 2283 (1982).

coupment of funds expended by them while serving in office and without authorization. Thus, based on the record before us, we will affirm the judgment of the district court with respect to this issue.

### F. The Inclusion of Marc Wolfe in the Order Granting Equitable Relief

 Mr. Wolfe is the Solicitor of the MCTA. He claims that he should not be named in the order "because he has neither the power nor legal authority to carry out [the July 6, 1988] Court order." Appellant's Brief at 6c. Wolfe argues that it is significant that the MCTA hired outside counsel to handle this case. *Id.* He also argues that since he is not a board member of the MCTA, he has no legal power or right to vote for or against the plaintiffs' reinstatement. *Id.*[26] The jury found that Wolfe was liable to both plaintiffs for improper firing.

On the basis of Fed.R.Civ.P. 65(d), we hold that the district judge did not abuse his discretion in this regard. Rule 65(d) states:

> Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Generally, "persons who are not actual parties to the action or in privity with any of them may not be brought within the effect of a decree merely by naming them in the order." 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2956 at 555–56

(1973) (footnote omitted). Furthermore, "[t]he only significant exception to this rule involves nonparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction. They may be held in contempt." Wright & Miller, *supra* at § 2956 at 556–57 (footnote omitted). In this case, Wolfe is a party and the jury found that he took overt steps to effect the politically motivated terminations of Flaxman and Savarese. We find these facts to be controlling.

The Supreme Court has indicated that the policy underlying Rule 65(d) is "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974). In *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 180, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973), the Supreme Court stated that Rule 65(d) "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." (citing *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945)). While, as *Golden State Bottling Co.* indicates, control may be a basis for including someone within an order, we do not find the lack of control over the parties dispositive if there is another basis for including the subject in the order. In this case, the fact that Wolfe may not have "control" over the defendants is not a sufficient basis for excluding him as he is a party to the litigation. Moreover, he is also an attorney to a party. Consequently, we do not find any of the policies underlying Rule 65(d) to be offended by including Wolfe in the order. Therefore, it was not an abuse of discretion for the district judge to have included Wolfe in the order.[27]

---

26. We note that plaintiff Flaxman was reinstated, but has since resigned. *See* Appellees' Brief at 37.

27. As the attorney for the MCTA, Wolfe would have been properly included in the order even if he had not been a party. *See* Fed.R.Civ.P. 65(d).

G. *The Award of Attorneys Fees*

On July 7, 1988, the district court considered the plaintiffs' request for attorneys fees and expenses and issued an order directing the defendants to reimburse the plaintiffs for reasonable attorneys fees in the total amount of $149,382.08. Rec.Doc. No. 197. The defendants then moved to correct and amend the order to reflect a payment of $36,272.72 by three of the defendants, Cadue, Joyce and the County of Monroe, who obtained a release from the judgment by paying this sum. This sum represented a portion of the plaintiffs' counsel fees and expenses. Rec.Doc. No. 204. On July 25, 1988, the parties stipulated that the order awarding expenses of litigation entered July 7, 1988 be amended in accordance with the motion of the defendants to provide that the award be in the amount of $113,109.36 to reflect credit for the previous payment by defendants Cadue, Joyce and the County of Monroe. Rec.Doc. No. 213.

Appellants have protectively appealed the order for attorneys fees in the event that the liability determination is reversed on appeal. Because we will affirm the determination of liability, we will affirm the order for attorneys fees in the amount of $113,109.36.[28]

## III. CONCLUSION

We hold that the district court did not err in admitting the statements made by defendant Bogen as we find the statements to be admissible under Fed.R.Evid. 801(d)(2)(A). We do, however, hold that the district court erred with respect to Savarese's award of compensatory damages and we will, accordingly, vacate this award and remand the issue to the district court for a new trial. Additionally, we will vacate and remand the award for delay damages based on erroneous application of Pennsylvania law by the district court. We will affirm both the order denying the injunction barring the state court actions and the order including defendant Wolfe. Finally, we will af-

firm the award of attorneys fees in light of our disposition affirming defendants' liability.

Based on the foregoing, we will affirm, in part, and reverse in part, the judgment of the district court.

Four-fifths of the costs taxed against appellants and one-fifth, against Savarese.

---

**28.** Our disposition is without prejudice to any subsequent application by plaintiffs for fees derived from work performed after the date in-

cluded in the previous petition for attorney's fees.