Sandra J. TAYLOR and Pam M. Johnson, Plaintiffs,

v.

CENTRAL PENNSYLVANIA DRUG AND ALCOHOL SERVICES CORPORATION and/or Central Pennsylvania Individual/Family Counseling, and William L. Clark, Defendants.

Civ. A. No. 4:CV–93–0993.

United States District Court, M.D. Pennsylvania.

June 30, 1995.

Michael L. Eggert, Dunaway Weyandt McCormich & Jones, State College, PA, for plaintiffs.

Stephen W. Furst, Bellefonte, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

Plaintiffs Sandra J. Taylor and Pam M. Johnson are former employees of defendant Central Pennsylvania Drug and Alcohol Services Corporation (CPDASC). Defendant William L. Clark was the president of CPDASC and its chief executive officer. Clark was plaintiffs' immediate supervisor. Plaintiffs allege that they were sexually harassed in the workplace by Clark and assert federal and state harassment claims on the basis of those allegations.

Taylor alleges that she was discharged from her position for unlawful reasons. Johnson alleges that she was constructively discharged from her position with CPDASC due to Clark's intolerable behavior.[1]

In an order dated September 27, 1994, this court granted plaintiffs' motion for sanctions and entered a default in their favor on liability issues. Under the court's ruling, only the determination of damages remains.

The court held a two-day bench trial[2] on the issue of damages and has received pro-

---

1. Plaintiff's complaint, Count IV, ¶ 52.

2. Both plaintiffs' cause of action accrued prior to the November 21, 1991 effective date of the 1991 Amendments to the Civil Rights Act of 1964.

posed findings of fact and conclusions of law from both sides. For the reasons which follow, we will enter an order: 1) awarding Taylor $25,000.00 as compensatory damages under the Pennsylvania Human Relations Act (PHRA); 2) awarding Johnson $25,000.00 as compensatory damages under the PHRA; 3) awarding Taylor $46,481.52 as back pay, including prejudgment interest, under Title VII and the PHRA; 4) awarding Johnson $16,273.54 as back pay, including prejudgment interest, under Title VII and the PHRA. Judgment will therefore be entered in favor of Taylor in the aggregate sum of $71,481.52, and in favor of Johnson in the aggregate sum of $41,273.54. Liability is joint and several among all defendants.

## STIPULATED FACTS

The parties have stipulated to the following facts, which the court incorporates as part of its findings of fact:[3]

1. CPDASC is a Pennsylvania business corporation which traded and did business, as "divisions," under several fictitious names, including:

—Tallyrand Retreat, an inpatient drug and alcohol treatment facility located in Bellefonte, Pennsylvania;

—Central Pennsylvania Individual and Family Counseling—an outpatient drug and alcohol treatment facility located in Bellefonte, Pennsylvania; and

—Central Pennsylvania Individual and Family Counseling—Mifflin/Juniata an outpatient drug and alcohol treatment facility with offices in Lewistown and Mifflintown, Pennsylvania.

2. CPDASC also owned one-half the stock of Mainstream Counseling, Inc., an outpatient drug and alcohol treatment facility doing business in Huntingdon, Pennsylvania.

3. Defendant Clark is a male, born April 21, 1944. He received a bachelor's degree from Ohio University in 1976 and a master's degree in education in rehabilitation counseling from Pennsylvania State University in 1980. He has completed all work toward his Ph.D. at Pennsylvania State University (Penn State) with the exception of his dissertation.

4. Clark, the founder of CPDASC, was President and Chief Executive Officer throughout plaintiffs' tenure of employment.

5. Taylor was employed by CPDASC from April 11, 1988 until her discharge on July 1, 1991. Taylor is female, born on December 29, 1940. She is a high school graduate with no additional education. She was employed by CPDASC as a bookkeeper. When she left the employ of CPDASC, her annual gross salary was $20,991.51, and her title was office manager.

6. Johnson was employed by CPDASC from September 1, 1990 until her resignation on August 9, 1991. Johnson is a female, born on February 16, 1962. She is a high school graduate. Prior to her resignation from CPDASC she had obtained no additional education. She is now a candidate for a bachelor's degree from Penn State. She was employed by CPDASC as an accounts receivable clerk and was earning a gross annual salary of $16,443.00 when she left its employ.

7. Plaintiffs were employed at CPDASC corporate headquarters located at 527 Willowbank Street in Bellefonte.

8. Prior to July 1, 1991, CPDASC had a policy of awarding "step" raises of five (5%) percent to all of its employees on the anniversary of their employment. From July 1, 1991 to July 1, 1992, only twenty-five (25%) percent of the "best" employees received "step" raises. Step raises were discontinued altogether after July 1, 1992.

9. CPDASC established a policy of awarding annual cost of living increases to all employees effective July 1 of each year. A 3% "cost of living" raise was awarded on July 1, 1992 and a 2% "cost of living" raise was awarded on July 1, 1993.

10. CPDASC had established a profit sharing plan whereby the corporation paid in to the plan a portion of its profits which were credited to the account of its employees upon

---

They, therefore, have no right to a jury trial on the claims asserted. A jury trial is unavailable under the PHRA as well.

3. In some cases, the parties' stipulation is set forth *verbatim;* in others, the wording has been altered, but not the content.

a formula based upon salary and length of service. CPDASC made contributions to this plan for its fiscal years ending July 1 of the following years in the following amounts: 1989—$29,000.00; 1990—$0.00; 1991—$33,000.00; 1992—$0.00; 1993 and thereafter—$0.00. Taylor and Johnson received whatever benefits from this plan to which they may have been entitled for prior contributions.

11. CPDASC provided employees with health insurance benefits. Coverage for the employee's dependents could be obtained if the employee paid for the expanded coverage.

12. During plaintiffs' employ their health insurance coverage cost CPDASC approximately $190.00 per month per plaintiff.

13. Neither plaintiff incurred any covered medical expense subsequent to leaving CPDASC' employ.

14. CPDASC had a policy of paying each of its employees an annual Christmas holiday bonus of $100.00.

15. In November, 1991, Taylor went into business for herself, opening a consignment gift shop. That business was closed in June, 1992.

16. In April, 1993, Taylor again went into business for herself, opening a discount greeting card shop. That business was closed in September, 1994.

17. In September, 1991 Johnson obtained part-time employment with Counseling Services, Inc. and received wages totalling $569.43 from that position. Johnson resigned from that position on October 22, 1991, and accepted another part-time position with Lawrence T. Clayton and Counseling Associates, Inc. Her gross compensation from that position was: a) $2,357.25 in 1991; b) $10,714.30 in 1992; c) $9,398.26 in 1993. She received additional compensation from that position in 1993 totalling $4,868.50.

18. CPDASC sold the Talleyrand Retreat division on or about August 31, 1992.

19. CPDASC sold the Central Pennsylvania Individual and Family Counseling—Bellefonte division under contract dated December 11, 1992, effective January 1, 1993.

20. CPDASC sold the Central Pennsylvania Individual and Family Counseling—Mifflin/Juniata division on or about November 1, 1993.

21. Effective September 4, 1991, CPDASC hired Rose Stemler to work approximately 20 hours per week. Hired initially as a consultant; she was later given the title of office manager. Ms. Stemler is a female and a high school graduate, with experience in bookkeeping, accounting and computer systems.

22. The further computerization of office and administrative functions had been planned for some time, but had been delayed pending availability of an outside computer expert to program the new system.

23. Once this initial work had been done, day-to-day operation of the new system could readily have been handled by either Johnson or Taylor.

24. Prior to September 4, 1991, CPDASC used computers only to keep track of services rendered, to perform certain billing functions, and to generate payroll.

25. Beginning September 4, 1991, CPDASC began computerizing all of its bookkeeping, accounting and personnel functions.

26. On or about October 29, 1991, Zimmerman resigned and Ina Reed was hired to work in the "corporate office."

27. Both Taylor's and Johnson's, as well as additional duties, were subsequently performed by one full-time (forty hours per week) and one part-time (twenty hours per week) employee.

28. By January 1, 1993, only one CPDASC employee remained at the "corporate offices," Rose Stemler. Stemler worked approximately 8 hours per week. By November 1, 1993, Stemler's hours had decreased to approximately 2 to 3 hours every two weeks.

## COURT'S FINDINGS OF FACT

Based upon the evidence submitted at the bench trial on the issue of damages, the court makes the following additional findings of fact:

29. Taylor performed payroll and bookkeeping duties for all component divisions of CPDASC. Her work experience prior to going to CPDASC consisted primarily of bookkeeping and related office work and included experience working with computers, gained both at CPDASC and at prior jobs.

30. Johnson's work experience prior to going to CPDASC consisted primarily of office and bookkeeping work for various employers, including computer work performed both at CPDASC and for previous employers. Her work at Penn State, a previous employer, included computerizing her department. Johnson did the accounts receivable work for all CPDASC divisions. In the course of those duties, Johnson had full access to company finances and cash receivables and regularly made bank deposits. She had Clark's full confidence, despite his knowledge of her previous involvement in an incident at Penn State involving her embezzlement of university funds. While employed by the university, Johnson took university funds, later confessed and repaid the monies taken. Clark had full knowledge of this incident when he hired her and nevertheless trusted her with extensive fiscal responsibilities.

31. CPDASC employees received a 4.4% cost of living raise on July 1, 1991.

32. Both plaintiffs received excellent work evaluations during their entire period of employment with CPDASC.

33. Had Johnson not resigned, she was the favored candidate for the position of Executive Director about to be vacated by Alan Coudriet.

34. After Taylor's discharge, her duties were distributed among Lori Zimmerman, Roberta Warner and Pam Johnson. After Johnson was constructively discharged, her duties were assumed by Ina Reed, a full-time employee. Rose Stemler later assumed duties formerly performed by both plaintiffs. In August, 1991, CPDASC hired Sarah Trost as a full-time employee. Trost also performed work formerly carried out by the plaintiffs.

35. For years, Clark had intentions of computerizing additional accounting and personnel functions. Installation of the systems for those functions was to be performed by an outside consultant. This was accomplished until the summer of 1991. Once the initial installation had been performed, day-to-day record keeping and operations would have been carried out by plaintiffs, just as it was by Rose Stemler after their departure, and they both would have remained employed full-time by CPDASC until January 1, 1993 performing the work carried out by Stemler, Reed and Trost during that period. Thereafter, Taylor would have remained with CPDASC working part-time, approximately eight hours per week until November 1, 1993.

36. Had her employment not been unlawfully terminated, Taylor's salary would have been increased by a 4.4% cost of living raise effective July 1, 1991; a 5% merit raise effective April 11, 1992; another 3% cost of living raise effective July 1, 1992; and a final 2% cost of living raise effective July 1, 1993. Taylor is entitled to backpay, including fringe benefits and all pay increases, commencing from the date of her discharge, July 1, 1991, until November 1, 1993. She is entitled to pay based on full time work until January 1, 1993, and pay at the rate of one-fifth of her full annual salary from January 1 through November 1, 1993.

37. Had she not been constructively discharged, Johnson's salary would have been increased by a 5% merit raise effective September 1, 1991; and a 3% cost of living raise effective July 1, 1992. Johnson is entitled to backpay, including fringe benefits and all pay increases, commencing from the date of her constructive discharge, August 10, 1991, until November 1, 1993, based on her full annual salary for the entire time period.

38. Taylor received Pennsylvania unemployment compensation benefits after her discharge, amounting to $4,646.00 in 1991 and $7,272.00 in 1992. Her backpay award will not be reduced by those amounts.

39. After her discharge, Taylor consistently and unrelentingly made reasonable and diligent efforts through many channels to secure other employment for which she was qualified through the date when she would have ceased to be employed full-time

by defendants. In spite of such efforts and through no fault or failing of her own, Taylor's search for other employment was not successful until December, 1994, when she secured a job caring for an elderly couple.

40. When her efforts at securing other employment proved unsuccessful, Taylor twice attempted to start her own business. Both ventures ultimately failed, and neither showed a profit. Taylor opened a gift shop in November, 1991, with start-up capital borrowed from relatives. That business folded in July, 1992, showing a total deficit of $6,000.00.

41. Taylor's second business venture was a shop selling discount greeting cards which she opened in April 1993 with start-up capital borrowed from her son. That business also folded and never showed a profit.

42. Even during the periods she was operating the two shops, Taylor remained available for other employment. Had she been offered a position by an employer, she would have accepted due to the non-profitability of both ventures. She received no offers of employment of any nature during the entire period she was employed.

43. Taylor suffered emotional distress and extreme mental anguish as a result of Clark's humiliating and offensive conduct toward her while she was in his employ and as a result of her retaliatory discharge from the employ of CPDASC.

44. Taylor was married to one of her co-workers at CPDASC in January, 1991.

45. The extremely offensive nature of the harassment caused both plaintiffs to fear Clark and become concerned for their physical safety around him.

46. Taylor's husband became aware of Clark's harassing conduct toward her when he overheard Clark making inflammatory and harassing remarks to his wife. Taylor's husband confronted Clark about his conduct, and ultimately lost his job due to the confrontation. Taylor's employment was terminated not long thereafter, leaving both her and her husband unemployed and without a source of income other than unemployment compensation benefits.

47. Their joint unemployment was a source of considerable financial and emotional strain and exacted a serious toll on their marriage and ultimately was a primary cause of their decision to divorce.

48. Due to all of these pressures, i.e. the dissolution of her marriage, financial worries, and humiliation over the harassment and the unjustness of her treatment by Clark, plaintiff suffered depression and extreme anxiety over a long period, all of which were exacerbated when her dire financial straits forced her to file Chapter 7 bankruptcy in 1992.

49. Johnson also made reasonable and diligent efforts to secure other employment following her departure from CPDASC.

50. Johnson has been a candidate for a bachelor's degree from Penn State since the fall semester of 1991. Her pursuit of a college degree has not interfered in any manner with her availability for employment and she, in fact, worked all of the hours made available to her by post-CPDASC employers.

51. Johnson has suffered humiliation, emotional distress and extreme mental anguish as a result of Clark's sexually harassing conduct toward her. His conduct adversely affected her productivity at work, making it difficult for her to concentrate on the tasks at hand. Due to his extreme and sometimes bizarre behavior, she became so fearful of him and of the possibility that he might physically harm her or attempt to stalk her outside of work that she went to great lengths to conceal from him her home address, even to extent of ensuring that such information did not appear in her CPDASC personnel records. During her last few months at the job, she frequently called in sick or took vacation or personal days off to minimize the amount of time she had to spend in Clark's presence. She also manipulated her working hours and tasks as much as possible to minimize the time spent around Clark, regularly coming in very early in the morning so that she could leave early or run banking errands in the afternoon when Clark was more likely to be around.

52. Clark's sexual harassment also caused Johnson to suffer sexual problems in her marriage.

53. Clark's harassment and Johnson's unlawful discharge were a substantial contributing factor in the myriad personal and financial problems suffered by Johnson subsequent to her discharge.

## DISCUSSION

### Back pay award

■ An award of back pay is one of the Title VII remedies expressly sanctioned by Congress. Although not mandatory, back pay is routinely awarded to successful Title VII plaintiffs absent a compelling reason to deny it, consistent with the Act's objective of placing the plaintiff in the position she would have enjoyed had there been no discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 880 (6th Cir.1991) and *Wooldridge v. Marlene Industries Corp.*, 875 F.2d 540, 549 (6th Cir.1989) ("[B]ack pay should always be awarded absent the existence of exceedingly rare special circumstances.").[4]

■ The back pay award encompasses not only lost wages, but also the benefits plaintiff would have received incident to her employment. *Mitchell v. Seaboard System Railroad*, 883 F.2d 451, 452–53 (6th Cir.1989) and *Kelly v. Matlack, Inc.*, 903 F.2d 978, 984–85 (3d Cir.1990) (ADEA case).

■ A successful Title VII plaintiff is also entitled to prejudgment interest, subject to the discretion of the court. *Scarfo v. Cable-tron Systems, Inc.*, 54 F.3d 931, 960–61 (1st Cir.1995); *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512 (11th Cir.1987); *Earnhardt v. Puerto Rico*, 744 F.2d 1, 3 (1st Cir.1984); and *Maturo v. National Graphics, Inc.*, 722 F.Supp. 916, 930 (D.Conn.1989). There is no general consensus, however, as to how such interest should be calculated. Because there is no federal statute expressly governing the calculation of interest on such claims,[5] the federal courts have been compelled to find their own solution, leading to considerable diversity of opinion, much inconsistency, and no small amount of confusion.

Some courts have applied 28 U.S.C. § 1961, generally under the rationale that prejudgment and postjudgment interest should be calculated on the same basis. See, e.g., *Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir.1986), *modified in part by*, *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1557–58 (9th Cir.1992); and *Northrop Corp. v. Triad International Marketing S.A.*, 842 F.2d 1154, 1155 n. 2 (9th Cir.1988) (In *dicta*, the court stated: "Under federal law the rate of both prejudgment and postjudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate."). While logical, this approach is, unfortunately, inconsistent with apparent congressional intent. In amending section 1961, Congress deleted a suggested provision making it applicable to prejudgment interest. See: *Hollie v. Korean Air Lines, Co., Ltd.*, 834

4. Section 2000e–5(g) provides in relevant part:
If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer ... responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.... Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.
42 U.S.C. § 2000e–5(g).
Although we cast our discussion of the law largely in terms of the back pay under Title VII,

it is equally available as a remedy for defendants' violation of the PHRA, and we rest our award of back pay on that ground as well. Section 962(b) of the PHRA provides in relevant part:
.... If the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay, or any other legal or equitable relief as the court deems appropriate.
43 P.S. § 962(c). See also: *Cain v. Hyatt*, 734 F.Supp. 671, 685 (E.D.Pa.1990).

5. The opposite is true of postjudgment interest. See: 28 U.S.C. § 1961.

F.Supp. 65, 70 (S.D.N.Y.1993), citing, 127 Cong.Rec. 29865 (daily ed. Dec. 8, 1981) (Statement of Sen. Grassley).

Other courts have tied their calculations to the Internal Revenue Service (IRS) adjusted prime rate, See: 26 U.S.C. § 6621, based on the practice of calculating interest on pay awards entered under the National Labor Relations Act (NLRA) using IRS prime rates. See, e.g., *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir.1991) and *Guardian Pools, Inc.*, 828 F.2d at 1512.

Still other courts have devised their own methods to arrive at a rate which will fairly compensate the plaintiff. See, e.g., *Davis v. City and County of San Francisco*, 747 F.Supp. 1370, 1373 (N.D.Calif.1990) (interest calculated "at 90% of the average prime rate [as obtained from the Federal Reserve Bank] for the year in which the calendar quarter occurs."), *aff'd, Davis v. City and County of San Francisco*, 976 F.2d 1536, 1557–58 (9th Cir.1992).

■■ Of these approaches, we find the adoption of IRS overpayment rates, 26 U.S.C. § 6621(a)(1), to be the most logically consistent with the purpose for awarding prejudgment interest, i.e., to place the plaintiff in the position she would have been in had she not been unlawfully deprived of her salary [6] and with the history of Title VII. As the Eleventh Circuit observed in adopting IRS prime rates in *Guardian Pools, Inc.*, 828 F.2d at 1512, Title VII remedies are in many ways modeled upon remedies available under the NLRA. *Id.*, citing *Brown v. A.J. Gerrard Manufacturing Co.*, 715 F.2d 1549 (11th Cir.1983) (en banc) (per curiam). Since 1977, the National Labor Relations Board has calculated prejudgment interest on back pay awards using IRS prime rates. *Id.*, citing *Florida Steel Corp.*, 231 NLRB No. 117, 96 L.R.R.M. 1070, 1977 WL 9474, *enforcement denied on other grounds, sub nom., NLRB v. Florida Steel Corp.*, 586 F.2d 436, 451 (5th Cir.1978). Other courts in this circuit, in-

cluding this court in *Gallo v. John Powell Chevrolet, Inc.*, 779 F.Supp. 804, 817 (M.D.Pa.1991), have adopted IRS prime rates under the same rationale. In reaching the same conclusion we reach here, the United States District Court for the Eastern District of Pennsylvania reasoned in *Frazier v. Southeastern Pennsylvania Transportation Authority*, 814 F.Supp. 11, 13 (E.D.Pa.1993) that "Interest on back pay awards has consistently been awarded under the NLRA," and its remedies served as the blueprint for fashioning Title VII remedies. See also: *E.E.O.C. v. Reads, Inc.*, 759 F.Supp. 1150, 1162 n. 20 (E.D.Pa.1991) (prejudgment interest on back pay interest in Title VII case awarded using IRS rates and compounded quarterly); *Green v. United States Steel Corp.*, 640 F.Supp. 1521, 1549 (E.D.Pa.1986), *vacated in part on other grounds*, 843 F.2d 1511 (3d Cir.1988), *cert. denied*, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990) (same). Cf. *McKelvy v. Metal Container Corp.*, 125 F.R.D. 179 (M.D.Fla.1989) (court applied IRS *underpayment* rate in calculating prejudgment interest on Title VII back pay award). This result is also consistent with the Third Circuit's preference for uniformity in calculating prejudgment interest on federal civil rights claims. See: *Savarese v. Agriss*, 883 F.2d 1194, 1207 (3d Cir.1989) (advocating "federal uniformity in the area of damages in civil rights cases").

We will, therefore, calculate plaintiffs' prejudgment interest on their back pay awards using the overpayment rates published at IRS Rev.Rul. 95–33. See 26 C.F.R. § 301.6621–1. We choose the overpayment rates as prescribed in 26 U.S.C. § 6621(a)(1), rather than the underpayment rates set forth in 26 U.S.C. § 6621(a)(2), as the former is a better reflection of lost investment opportunities. While this exercise requires numerous calculations, in view of the varying rates of pay and varying interest rates applicable to the back pay period, it seems the fairest way to make plaintiffs whole. The economic

---

**6.** Back pay is awarded under Title VII, 42 U.S.C. § 2000e–5(g), "to make-whole persons who suffered injury through past discrimination and to end employment discrimination." *Frazier v. Southeastern Pennsylvania Transportation Authority*, 814 F.Supp. 11, 13 (E.D.Pa.1993), citing

*Loeffler v. Frank*, 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549, 559 (1988) and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280, 298–99 (1975). "Prejudgment interest on such an award is 'an element of complete compensation.'"

use of judicial resources cries out, however, for a simpler solution.

■ Periods during which the plaintiff would not have worked due to a health condition, conflicting obligations or for other reasons, are excluded from the calculation period. *Inda v. United Air Lines, Inc.*, 405 F.Supp. 426, 434 (N.D.Cal.1975), *aff'd in part*, 565 F.2d 554, 562 (9th Cir.1977) *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978).

Title VII imposes a two-year statutory cap on the amount of back pay awardable, the PHRA a three-year cap. *Bereda v. Pickering Creek Industrial Park, Inc.*, 865 F.2d 49, 54 (3d Cir.1989), citing *Albemarle*, 422 U.S. at 410 n. 3, 95 S.Ct. at 2368 n. 3, 45 L.Ed.2d at 292 n. 3; 42 U.S.C. § 2000e-5(g) and 42 P.S. § 962(c).[7] Calling this limitation a "cap" is a misnomer. Rather, it states a limit as to the period of time prior to the filing of a complaint for which back pay may be awarded.

Plaintiffs' complaint was filed July 1, 1993. Back pay is claimed by Taylor from the date of her discharge on July 1, 1991 to November, 1993, the date when most business operations ceased. Johnson claims back pay dating from her August 9, 1991 resignation. Neither plaintiff seeks back pay for a period more than two years prior to the filing of this action. Therefore, neither plaintiff's recovery is restricted by a statutory cap.

■ Back pay is awardable even if plaintiff's lost wages are not susceptible of an exact dollar calculation. "Mere difficulty" in calculating the award does not warrant its denial. *Christopher*, 936 F.2d at 880. Thus, if the plaintiff would have been paid on some basis other than a salary or hourly wage, or if she was denied raises, benefits, promotions, etc. due to discrimination, she can recover for all of those losses even though the court must estimate what she would otherwise have earned and/or the course her career would otherwise have taken. Any uncertainties are resolved against the discriminating employer. "Where it is impossible to reconstruct the employment history of each claimant, back pay equal to the maximum amount which could have been earned but for the discrimination is appropriate." *Wooldridge*, 875 F.2d at 549. In such cases, the courts have typically projected plaintiff's lost earnings by tracking the career of a similarly situated co-worker who was not subjected to discrimination and adjusting for distinctions between the situation of the co-worker and that of plaintiff. See, e.g., *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1119-20 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).

■ The award is not reduced by unemployment benefits collected by the plaintiff, consistent with the Third Circuit's view that such benefits are collateral and should not be used to reduce defendant's legal obligation to make the plaintiff whole. *McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214, 215-217 (3d Cir. 1984) (ADEA case) and *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir.1983). Cf. *Dillon v. Coles*, 746 F.2d 998 (3d Cir. 1984), (If the defendant-employer is the Commonwealth of Pennsylvania, it may deduct unemployment compensation benefits from back pay awards if it would have been entitled to bring a separate action under state law to recoup such benefits.)[8]

---

7. Section 2000e-5(g) provides: "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity] Commission." 42 U.S.C. § 2000e-5(g).

Section 962(c) tracks the Title VII language, but provides for a three-year cap instead of a two-year cap. It states: "Back pay liability shall not accrue from a date more than three years prior to the filing of a complaint charging violations of this act." 43 P.S. § 962(c).

8. A party receiving a back pay award who has received unemployment benefits has an obligation to notify and reimburse the Department of Labor and Industry under Pennsylvania law. Section 874 of the Pennsylvania Unemployment Compensation Law provides:

Notwithstanding any other provisions of this subsection, any person who has received or employer who has made a back wage payment pursuant to an award of a labor relations board arbitrator or the like without deduction for unemployment compensation benefits received during the period to which such wages are allocated shall notify the department immediately of the receipt or payment of such back wage award. The recipient of such back wage award, made without deduction for un-

■ Nor are plaintiffs' back pay awards reducible by the federal income tax which they would have paid on the wages earned. Although the back pay awards are taxable as income under federal law, *United States v. Burke*, 504 U.S. 229, 241–42, 112 S.Ct. 1867, 1874, 119 L.Ed.2d 34, 47 (1992), because the operations of CPDASC have ceased, rather than have defendants withhold and pay over to the federal and state government any income tax owed, we will award the entire amount to plaintiffs with no deductions for federal, state or local income taxes, or FICA (Federal Insurance Contributions Act, 26 U.S.C. § 3101) contributions, (See: *Burke*, 504 U.S. at 231 n. 1, 112 S.Ct. at 1869 n. 1, 119 L.Ed.2d at 41 n. 1.) and leave to plaintiffs the obligation of remitting to the appropriate governmental entity any tax or contribution due.

■ Each back pay award is reducible, however, by any amounts the plaintiff actually earned or could have earned through the exercise of reasonable diligence. See: *Landgraf v. USI Film Products*, —— U.S. ——, —— n. 5, 114 S.Ct. 1483, 1490 n. 5, 128 L.Ed.2d 229, 245 n. 5 (1994), citing 42 U.S.C. § 2000e–5(g). Plaintiffs have a duty to mitigate damages by seeking suitable employment, and those who fail to carry out this obligation forfeit their right to continuing back pay. See: *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721, 733 (1982) and *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273–77 (4th Cir.1985).

■ Plaintiffs are not required to seek out or accept any position which may be available. They are not, for example, required to "go into another line of work, accept a demotion, or take a demeaning position," to preserve their right to back pay, *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721, 732–33 (1982), but may not refuse other work simply because it pays less than they might wish or is less desirable than their previous employment. *Ellis v. Ringgold School District*, 832 F.2d 27, 30 (3d Cir.1987). Reason-

able diligence, in the context of keeping a new job, means that the plaintiff must have conducted herself "reasonably and responsibly in accordance with employer rules." *Brady*, 753 F.2d at 1277.

■ The burden of proving that plaintiff failed to exercise reasonable diligence in seeking out other employment is on the employer. *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1004–1005 (3d Cir.1988), citing, *inter alia*, *Ford Motor Company v. EEOC*, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721, 733 (1982). "To cut off a back pay award, defendants must prove that the plaintiff did not exercise reasonable diligence in seeking employment substantially equivalent to the position he lost." *Carden*, 850 F.2d at 1005. This burden may be satisfied by proving that: 1) substantially equivalent positions were available; and 2) the plaintiff failed to use reasonable care and diligence in seeking such positions. *Wooldridge*, 875 F.2d at 548.

■ Further, the calculation period for back pay terminates if the former employer establishes that the plaintiff's position would have been eliminated at some point during the alleged entitlement period for business reasons or other unrelated factors. *Bhaya v. Westinghouse Electric Corp.*, 709 F.Supp. 600 (E.D.Pa.1989). Back pay terminates as of the date when the plaintiff's former job would have been eliminated due to other factors. *Id.*

■ Back pay is normally computed at the rate the individual was paid at the time of discharge. Here, the parties have stipulated to plaintiffs' rate of pay at the time of discharge. Back pay may include anticipated pay increases based upon satisfactory performance. It has also been stipulated that the previous policy of CPDASC to award "step" raises automatically on the anniversary of employment was abandoned, with only exceptional performance meriting these raises after July, 1991, and no employees receiving these raises after July 1, 1992.

employment compensation benefits received during the period, shall be liable to pay into the Unemployment Compensation Fund an amount equal to the amount of such unemployment compensation benefits received.
43 P.S. § 874(b)(3).

Cost of living raises of 3% may be awarded if benefits were to continue past July 1, 1992.

■ Back pay may include other benefits, if paid to other employees. Had they remained in the employ of CPDASC, plaintiffs would have been eligible to receive the annual Christmas bonuses. They are, therefore, entitled to have the bonuses which they would have received included in their award of back pay.

■ Their asserted right to recover insurance premiums payable by CPDASC during their term of employment is another matter. Title VII plaintiffs have no right to recover such premiums for the period subsequent to their leaving the defendant's employ, unless they can establish: 1) that they incurred an expense for the purchase of equivalent substitute medical insurance; 2) that they incurred medical expenses which would otherwise have been paid by their employer-provided coverage.

Here, neither element was established by either plaintiff. Each was apparently without medical coverage for the period she was unemployed. However, neither plaintiff introduced evidence of expenses incurred during that period for substitute coverage or for medical care. *Kossman v. Calumet County,* 800 F.2d 697 (7th Cir.1986), *cert. denied* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 151 (1987). Plaintiffs are not, therefore, entitled to any recovery associated with the cessation of insurance coverage subsequent to their departure from CPDASC's employ.

**Calculation of plaintiffs' back pay awards**

The basis for the court's award and calculation of back pay is set forth at length in the findings above and is not reiterated here.[9] We address here only certain legal arguments not discussed above.

■ Defendants argue that Taylor's right to back pay ceased when she started her own business ventures. They contend that by opening a shop she voluntarily removed herself from the job market, legally terminating her right to continued back pay.

As support for this argument, defendants cite *Johnson v. Memphis Police Dept.,* 713 F.Supp. 244 (W.D.Tenn.1989). We do not agree with the analysis of *Johnson* on this issue and note that the argument accepted in *Johnson* on which defendants rely was specifically rejected by the Third Circuit in *Carden.* In that case, the Third Circuit stated:

> The analogy Westinghouse draws between self-employment and a return to school as a full time student, is not persuasive. An individual who attends school as a full-time student does so in order to gain some type of future pecuniary advantage. Such an individual essentially seeks future earnings ... (footnote omitted) while a self-employed person works for *both* current and future earnings. When monetary expectations are directed only towards the *future,* back pay cannot legitimately be claimed since no present compensation can be expected. However, a self employed individual has present, as well as future, financial expectations. As such, back pay can be properly claimed.

*Id.* 850 F.2d at 1005, footnoting *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 268 (10th Cir.1975) ("[W]hen an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school also would be like receiving a double benefit.")

The Third Circuit held in *Carden,* that the "threshold question" was whether the plaintiff's "choice to enter into his own business a reasonable method of mitigating damages?" The burden to prove that it was not, the court held, falls on the defendant. *Id.* at 1005. The decision to become self-employed does not, by itself, indicate a lack of reasonable diligence. *Id.*

Here, we find that that burden has not been met by defendants. Taylor testified convincingly that she remained available for work during the period she was operating the shops and would have closed the shops or found someone to operate them and immediately accepted other employment had a posi-

---

9. The court's calculation of back pay, together with prejudgment interest, is set forth in an appendix to this memorandum, which will be filed and docketed separately in view of its length.

tion been offered to her, because neither venture ever earned a profit.

Further, Johnson's attempt to mitigate her back pay damages by starting her own businesses when no offers of employment were forthcoming was a laudable effort and should not be used against her to cut off her right to receive back pay. A ruling to the contrary would serve as a disincentive to Title VII plaintiffs unable to secure employment. Individuals in that position would have no incentive to use whatever talents or income-earning abilities they may have to earn money through self-employment as a stop-gap measure until full-time employment becomes available. See, e.g. *Hansard v. Pepsi–Cola Metro. Bottling Co.,* 865 F.2d 1461 (5th Cir. 1989) (Plaintiff's attempt to mitigate back pay damages by starting a flea market business did not terminate his right to back pay). We conclude, therefore, that Taylor's entitlement to back pay includes the periods during which she operated a shop and that there is no offset for profits earned through those ventures, because neither earned a profit.

**Compensatory damages for harassment under the PHRA**

■ Plaintiffs seek compensatory damages for Clark's sexual harassment of them during their employment with CPDASC. Such damages are not available to plaintiffs under Title VII, since their claims arose prior to the November 20, 1991 effective date of the 1991 Civil Rights Act. *Landgraf v. USI Film Production,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). See also: *Harris v. Forklift Systems,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ Compensatory damages are, however, available to plaintiffs under the Pennsylvania Human Relations Act (PHRA). *Brown Transport Corporation v. Commonwealth of Pennsylvania,* 133 Pa.Cmwlth. 545, 578 A.2d 555, 562 (1990) and *Consumers Motor Mart v. Pennsylvania Human Relations Commission,* 108 Pa.Cmwlth. 59, 529 A.2d 571 (1987) (damages recoverable for harassment and retaliatory discharge under the PHRA) "Unlike Title VII ... the relief provision of the PHRA, 43 P.S. § 962(c) is quite broad and expressly authorizes action including but not limited to back pay or 'any other legal or equitable relief as the court deems appropriate.'" *Keck v. Commercial Union Insurance Co.,* 758 F.Supp. 1034, 1039 (M.D.Pa. 1991) (Rambo, C.J.). Cf. *Protos v. Volkswagen of America, Inc.,* 797 F.2d 129 (3d Cir.1986), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). (Compensatory and punitive damages unavailable under the pre–1991 amendment version of Title VII, 42 U.S.C. § 2000e–5(g).)

■ Punitive damages are available as well under the PHRA, but are not sought here. Plaintiffs withdrew their claims for punitive damages at trial.

As we stated above, all liability issues were determined in plaintiff's favor prior to commencement of the bench trial. Testimony at trial was, therefore, limited to the extent of the harm caused to the two plaintiffs by Clark's sexually harassing comments and conduct. Both plaintiffs testified convincingly and in excruciating detail about the suffering Clark's deplorable conduct caused them. Taylor testified that Clark was a frightening figure to work for—that she had frequently seen him berate and belittle employees in front of their co-workers at staff meetings, and was for that reason frightened to confront him about his sexually harassing conduct toward her. She also testified that she very much needed the job with CPDASC to support herself. While she was employed at CPDASC, Taylor married one of her co-workers. She attempted to conceal from her husband Clark's harassing conduct toward her because she feared how he would react and because she did not want to risk losing her job. Taylor testified that she not infrequently became so upset by Clark's harassment, lewd and obscene remarks and conduct directed toward her that she became physically ill. One duty which she particularly dreaded was going to Clark's office to have him sign payroll checks. Taylor testified that he would close the door and then verbally and sometimes physically harass her.

On one such occasion, Taylor's husband overheard Clark make a vulgar remark to her, confronted Clark, and told him to "keep his hands off" of his wife. Clark fired her plaintiff's husband on the spot.

Not long thereafter, Clark discharged the plaintiff as well. The couple had no source of income at that point, and the ensuing financial problems placed a severe strain on the marriage, ultimately causing it to end in divorce in January, 1994. Taylor testified that she unrelentingly sought employment through any conceivable avenue, to no avail. Her automobile was repossessed, and she was ultimately forced into Chapter 7 bankruptcy because she was unable to pay her creditors. She testified that she obtained food from local food banks and got her clothes from church bazaar sales. Her financial woes and divorce caused her to become severely depressed to the point of considering suicide. In December, 1994, she was notified that her electricity would be shut off because she had not paid the bills. At that time, she owed three months rent on the card shop and could not pay the house insurance due. Out of desperation, she contacted the state welfare office to apply for benefits. A few weeks later, just prior to the start of trial, she obtained a job caring for an elderly couple.

Johnson described the same sort of abusive personality and testified to similar incidents of verbal and physical sexual harassment. Johnson testified that initially she thought the abuse would cease. When it did not, she continued working because she needed the money and had no other source of support. She had plans to be married in April, 1992 and testified that the abuse became worse as her wedding day approached. She testified that she attempted to lessen the harassment by spending as little time around Clark as possible. She even adopted extreme hours to avoid spending time around him. She testified that she began coming to work at 6:30 A.M. and leaving at 3:30 P.M. to avoid Clark. As in Taylor's case, Clark's conduct went far beyond lewd or suggestive remarks. She described an incident in which he grabbed her coat lapels, and yanked on them, making an obscene remark as he did so. Like Taylor, Johnson was extremely frightened of Clark and had witnessed him treating others in an abusive and threatening manner and felt that he was capable of extreme, perhaps even physically abusive behavior. Johnson testified that she lived in extreme fear of Clark's showing up at her apartment or confronting her outside of work. To guard against that possibility, she took extreme measures to conceal her home address from him. Johnson testified that near the end of her employment with CPDASC she became so distraught and so frightened by the possibility that Clark would take some action against her that at times she would go to her apartment after work and just sit there in fear, with the shades drawn. She described an incident in which she became extremely frightened when she observed a car parked in her apartment lot with a man seated inside who appeared to be watching her building. She became convinced that the man in the car was Clark and became extremely upset, convinced that he was there to harm her. She continued observing the car, and then discovered that the man observing her building was, in fact, a police officer. Johnson testified that she realized at that point that she had to do something to change her situation because of the devastating toll it was having on her. Not long thereafter, and shortly after her marriage ended, she left the employ of CPDASC.

Clark's behavior toward both plaintiffs went far beyond sexual innuendos and improper remarks. Both plaintiffs described him as physically threatening and verbally abusive. Both were extremely frightened of him and of what he might do to them, at the office, and in Johnson's case, outside the office as well. Their fear was not irrational. They had seen Clark behave abusively toward them and toward their co-workers. They had witnessed his temper.

All of this took an extreme toll on the lives of both plaintiffs. Both lived in fear of Clark while employed at CPDASC but felt they had to stay because they had no other income. In Taylor's case, the toll on her life extended long after she was fired by Clark. As a direct result of her unlawful termination, she suffered extreme financial reverses which led ultimately to the dissolution of her marriage, and caused her to file bankruptcy and seek welfare benefits.

## CONCLUSIONS OF LAW

██ 1. Under Title VII of the Civil Rights Act and the PHRA, Taylor and Johnson are entitled to awards of back pay against defendants, who are jointly and severally liable for the same.

2. Taylor is entitled to recover the amount she would have earned had she not been discharged by defendants, inclusive of salary increases which she would have received had she not been unlawfully terminated, from July 1, 1991 to November 1, 1993, when she would no longer have been employed by defendants due to their cessation of operations. This amount will not be reduced, as Taylor did not have any interim earnings during the period.

3. Had it not been for her unlawful termination, Taylor would have remained employed by defendants until November 1, 1993. Neither changes in CPDASC's computer system nor the sale of the Talleyrand Retreat or Bellefonte outpatient divisions would have led to her dismissal on the ground that there was no longer a need for her services, since the work she performed remained and was performed during that period by other individuals.

4. Taylor exercised reasonable diligence in attempting to obtain a position substantially equivalent to that which she had with defendants.

5. Taylor exercised reasonable efforts in attempting to mitigate her damages by starting her own businesses in 1992 and 1993 after she had been unsuccessful in finding a job.

6. Taylor's back pay will not be reduced or offset during the periods in which she operated her own businesses, because she continued diligently to seek employment during these periods, was able and available to work at all such times, and the businesses both failed to generate any profits.

██ 7. Johnson is entitled to recover the amount that she would have earned had she not been constructively discharged by defendants, inclusive of salary increases which she would have received had she not been unlaw-fully terminated, from August 9, 1991 until November 1, 1993.

8. The defendants would have laid off Johnson, had she not been unlawfully terminated, on about January 1, 1993. However, she is entitled to back pay continuing to November 1, 1993 because she would have been able to continue in her position with the company which purchased the Bellefonte outpatient division, as did Sarah Trost.

9. Johnson's back pay will be reduced by the amount of her interim earnings from other employers during the time period for which she is entitled to back pay.

10. Had it not been for her constructive discharge, Johnson would have remained employed by defendants until November 1, 1993. Neither changes in CPDASC's computer system nor the sale of the Talleyrand Retreat or Bellefonte outpatient divisions would have led to her dismissal on the ground that there was no longer a need for her services, since the work she performed remained and was performed during that period by other individuals.

11. Johnson exercised reasonable diligence in attempting to obtain a position substantially equivalent to that which she had with defendants.

██ 12. Johnson's back pay will not be offset or reduced for the time periods during which she attended Penn State, because Johnson actually continued to work 30 to 35 hours per week during these periods, and she was able and available to work full-time during these periods had she been offered a job equivalent to her position at CPDASC.

13. The plaintiffs' back pay awards will not be reduced by tax withholding amounts.

14. Plaintiffs' back pay awards will not include health insurance premiums.

15. Taylor's back pay award will not be reduced by the amounts of unemployment compensation which she received in 1991 and 1992.

16. Taylor and Johnson are entitled to prejudgment interest on their back pay awards from the dates of their termination to the date of judgment calculated at the over-

payment rates set forth in 26 U.S.C. § 6621(a)(1).

■ 17. Both plaintiffs are entitled to compensatory damages under the PHRA for the humiliation, emotional distress and mental anguish which they suffered due to the sexual harassment directed against them, and in Taylor's case, due to her discharge.

18. Taylor is entitled to compensatory damages in the amount of $25,000.00. Further, since her termination was discriminatory and unlawful, defendants will be directed to expunge from her personnel file and any other employment records kept by defendants all references to her discharge or any allegations of misconduct on her part.

19. Johnson is entitled to compensatory damages in the amount of $25,000.00.

20. Taylor is entitled to back pay, with prejudgment interest, in the total amount of $46,481.52.

21. Johnson is entitled to back pay, with prejudgment interest, in the amount of $16,273.54.

\* \* \*

An order will be entered consistent with this memorandum.

## ORDER # 1

For the reasons set forth in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Final judgment is entered in favor of plaintiff Sandra J. Taylor and against defendants Central Pennsylvania Drug and Alcohol Services Corporation and/or Central Pennsylvania Individual/Family Counseling, and William L. Clark, jointly and severally, in the sum of $71,482.52, comprised of $25,000 compensatory damages and $46,481.52 for back pay, including prejudgment interest.

2. Final judgment is entered in favor of plaintiff Pam J. Johnson and against defendants Central Pennsylvania Drug and Alcohol Services Corporation and/or Central Pennsylvania Individual/Family Counseling, and William L. Clark, jointly and severally, in the sum of $41,273.54, comprised of $25,000 compensatory damages and $16,273.54 for back pay, including prejudgment interest.

3. The clerk is directed to file and docket separately the appendix to the accompanying memorandum setting forth the calculations of back pay and prejudgment interest.

4. The court will retain jurisdiction for the sole purpose of considering any motion of plaintiffs for attorneys' fees and costs. A separate order will issue regarding the same.

## APPENDIX TO MEMORANDUM OF JUNE 30, 1995

### Calculation of Back Pay and Prejudgment Interest

**Sandra J. Taylor**

1. Back pay

Annual rate of pay prior to 7/1/91 discharge $20,991.51

7/1/91—4.4% COLA increased annual rate of pay to $21,915.14

7/1/91—4/10/92

$$\frac{285}{365} \text{ days} \times \$21,915.14/\text{year} = \$17,111.82$$

4/11/92—5% anniversary date raise increased annual rate of pay to $23,010.90

4/11/92—6/30/92

$$\frac{81}{365} \text{ days} \times \$23,010.90/\text{year} = \$5,106.53$$

7/1/92—3% COLA increased annual rate of pay to $23,701.23

7/1/92—12/31/92

$$\frac{184}{365} \text{ days} \times \$23,701.23/\text{year} = \$11,948.00$$

1/1/93—commenced part-time work at one-fifth of the full-time annual rate of pay

1/1/93—6/30/93

$$\frac{181}{365 \text{ days}} \times \frac{\$23,701.23/\text{year}}{5} \qquad = \qquad \$\ 2,350.06$$

7/1/93—2% COLA increased full-time annual rate of pay to $24,175.25

7/1/93—10/31/93

$$\frac{123}{365 \text{ days}} \times \frac{\$24,175.25/\text{year}}{5} \qquad = \qquad \$\ 1,629.35$$

11/1/93—Business closed.

| | | |
|---|---|---|
| Total back pay | = | $38,145.76 |
| Plus Christmas bonuses 1991 & 1992 @ $100 | = | $   200.00 |
| Net back pay | = | $38,345.76 |

2. <u>Prejudgment interest.</u>

       A.  Prejudgment interest on back pay calculated as if paid monthly for period from 7/1/91 to 10/31/93.

8/1/91 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 8/1/91 to 12/31/91 @ 9% .09 × 5/12 × $1,826.26 | = | $   69.48 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,826.26 | = | $   36.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $   63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $  118.71 |
| | | $  287.64 |

9/1/91 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 9/1/91 to 12/31/91 @ 9% .09 × 4/12 × $1,826.26 | = | $   54.79 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,826.26 | = | $   36.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $   63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $  118.71 |
| | | $  273.95 |

10/1/91 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 10/1/91 to 12/31/91 @ 9% .09 × 3/12 × $1,826.26 | = | $   41.09 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,826.26 | = | $   36.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $   63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $  118.71 |
| | | $  260.95 |

11/1/91 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 11/1/91 to 12/31/91 @ 9% .09 × 2/12 × $1,826.26 | = | $   27.40 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,826.26 | = | $   36.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $   63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $  118.71 |
| | | $  246.56 |

12/1/91 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 12/1/91 to 12/31/91 @ 9% .09 × 1/12 × $1,826.26 | = | $   13.70 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,826.26 | = | $   36.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $   63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $  118.71 |
| | | $  232.86 |

1/1/92 pay—$1,926.26—(1/12 of $21,915.14 + 100.00 Christmas bonus)

| | | |
|---|---|---|
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × $1,926.26 | = | $ 38.53 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,926.26 | = | $ 67.42 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,926.26 | = | $ 125.21 |
| | | $ 231.16 |

2/1/92 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 2/1/92 to 3/31/92 @ 8% .08 × 2/12 × $1,826.26 | = | $ 24.35 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $ 63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $ 118.71 |
| | | $ 206.98 |

3/1/92 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 3/1/92 to 3/31/92 @ 8% .08 × 1/12 × $1,826.26 | = | $ 12.17 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $ 63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $ 118.71 |
| | | $ 194.80 |

4/1/92 pay—$1,826.26 (1/12 of $21,915.14)

| | | |
|---|---|---|
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $1,826.26 | = | $ 63.92 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,826.26 | = | $ 118.71 |
| | | $ 182.63 |

5/1/92 pay—$1,887.13 (10/30 × 1/12 × $21,915.14) + (20/30 × 1/12 × $23,010.90)

| | | |
|---|---|---|
| Interest from 5/1/92 to 9/30/92 @ 7% .07 × 5/12 × $1,887.13 | = | $ 55.04 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,887.13 | = | $ 122.66 |
| | | $ 177.70 |

6/1/92 pay—$1,917.58 (1/12 of $23,010.90)

| | | |
|---|---|---|
| Interest from 6/1/92 to 9/30/92 @ 7% .07 × 4/12 × $1,917.58 | = | $ 44.74 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,917.58 | = | $ 124.64 |
| | | $ 169.38 |

7/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 7/1/92 to 9/30/92 @ 7% .07 × 3/12 × $1,975.10 | = | $ 34.56 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,975.10 | = | $ 128.38 |
| | | $ 162.94 |

8/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 8/1/92 to 9/30/92 @ 7% .07 × 2/12 × $1,975.10 | = | $ 23.04 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,975.10 | = | $ 128.38 |
| | | $ 151.42 |

9/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 9/1/92 to 9/30/92 @ 7% .07 × 1/12 × $1,975.10 | = | $ 11.52 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,975.10 | = | $ 128.38 |
| | | $ 139.90 |

10/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $1,975.10 | = | $ 128.38 |

11/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 11/1/92 to 11/1/93 @ 6% .06 × 12/12 × $1,975.10 | = | $ 118.51 |

12/1/92 pay—$1,975.10 (1/12 of $23,701.23)

| | | |
|---|---|---|
| Interest from 12/1/92 to 11/1/93 @ 6% .06 × 11/12 × $1,975.10 | = | $ 108.61 |

1/1/93 pay—$2,075.10 (1/12 of $23,701.23 + $100.00 Christmas bonus)

| | | |
|---|---|---|
| Interest from 1/1/93 to 11/1/93 @ 6% .06 × 10/12 × $2,075.10 | = | $ 103.76 |

2/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 2/1/93 to 11/1/93 @ 6% .06 × 9/12 × $395.02 | = | $ 17.78 |

3/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 3/1/93 to 11/1/93 @ 6% .06 × 8/12 × $395.02 | = | $ 15.80 |

4/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 4/1/93 to 11/1/93 @ 6% .06 × 7/12 × $395.02 | = | $ 13.83 |

5/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 5/1/93 to 11/1/93 @ 6% .06 × 6/12 × $395.02 | = | $ 11.85 |

6/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 6/1/93 to 11/1/93 @ 6% .06 × 5/12 × $395.02 | = | $ 9.88 |

7/1/93 pay—$395.02 (1/5 × 1/12 × $23,701.23)

| | | |
|---|---|---|
| Interest from 7/1/93 to 11/1/93 @ 6% .06 × 4/12 × $395.02 | = | $ 7.90 |

8/1/93 pay—$402.92 (1/5 × 1/12 × $24,175.25)

| | | |
|---|---|---|
| Interest from 8/1/93 to 11/1/93 @ 6% .06 × 3/12 × $402.92 | = | $ 6.04 |

9/1/93 pay—$402.92 (1/5 × 1/12 × $24,175.25)

| | | |
|---|---|---|
| Interest from 9/1/93 to 11/1/93 @ 6% .06 × 2/12 × $402.92 | = | $ 4.03 |

10/1/93 pay—$402.92 (1/5 × 1/12 × $24,175.25)

| | | |
|---|---|---|
| Interest from 10/1/93 to 11/1/93 @ 6% .06 × 1/12 × $402.92 | = | $ 2.01 |
| | | $ 3,534.27 |

B. Prejudgment interest on back pay of $38,345.75 from 11/1/93 to 6/30/95:

| | | |
|---|---|---|
| 11/1/93 to 6/30/94 @ 6% per annum .06 × 8/12 × $38,345.75 | = | $ 1,533.83 |
| 7/1/94 to 9/30/94 @ 7% per annum .07 × 3/12 × $38,345.75 | = | $ 671.05 |
| 10/1/94 to 3/31/95 @ 8% per annum .08 × 6/12 × $38,345.75 | = | $ 1,535.83 |
| 4/1/95 to 6/30/95 @ 9% per annum .09 × 3/12 × $38,345.75 | = | $ 862.78 |
| | | $ 4,601.49 |

C. Total prejudgment interest-$ 8,135.76

Summary

| | | |
|---|---|---|
| Net back pay | - | $38,345.76 |
| Prejudgment interest | - | 8,135.76 |
| Net award | | $46,481.52 |

## Pam J. Johnson

1. Back pay

   Resigned 8/9/91—$16,443 annual rate of pay.

   8/10/91—8/31/91

| | | |
|---|---|---|
| $\frac{21}{365}$ days × $16,443.00/year | = | $ 946.03 |

   9/1/91—5% anniversary date raise increased annual rate of pay to $17,265.15

   9/1/91—6/30/92

| | | |
|---|---|---|
| $\frac{304}{365}$ days × $17,265.15/year | = | $14,379.74 |

   7/1/92—3% COLA increased annual rate of pay to $17,783.10

   7/1/92—6/30/93

| | | |
|---|---|---|
| 365 days @ $17,783.10/year | = | $17,783.10 |

   7/1/93—2% COLA increased annual rate of pay to $18,138.76

   7/1/93—10/31/93

| | | |
|---|---|---|
| $\frac{123}{365}$ days × $18,138.76/year | = | $ 6,112.51 |

   11/1/93—Business closed.

| | | |
|---|---|---|
| Total back pay | = | $39,221.38 |
| Plus Christmas bonuses 1991 & 1992 @ $100 | = | $ 200.00 |
| Net back pay | = | $39,421.38 |
| Less other earnings | | |
|     1991—$ 2,926.68 | | |
|     1992—$10,714.30 | | |
|     1993—$12,271.56 | | ($25,912.54) |
| Net back pay | | $13,508.84 |

2. *Prejudgment interest*

    A.  Prejudgment interest on pay for the period 8/10/91 to 10/31/93:

<u>1991</u>
(1) gross back pay
8/10/91 to 8/31/91

$\frac{21}{365} \times$ \$16,443/year      =      \$   946.03

9/1/91 to 12/31/91

$\frac{122}{365} \times$ \$17,265.15/year      =      \$ 5,770.82

Christmas bonus      +      \$   100.00

     \$ 6,816.85

(2) less other earnings      –      (\$ 2,926.68)

(3) net back pay due      =      \$ 3,890.17

9/1/91 pay—\$571.28 (21/14 3 × \$3,890.17)

| | | |
|---|---|---|
| Interest from 9/1/91 to 12/31/91 @ 9% .09 × 4/12 × \$571.28 | = | \$ 17.14 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × \$571.28 | = | \$ 11.43 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × \$571.28 | = | \$ 19.99 |
| Interest from 10/1/92 to 10/31/93 @ 6% .06 × 13/12 × \$571.28 | = | \$ 37.13 |
| | | \$ 85.69 |

10/1/91 pay—\$816.12 (30/343 × \$3,8901.17)

| | | |
|---|---|---|
| Interest from 10/1/91 to 12/31/91 @ 9% .09 × 3/12 × \$816.12 | = | \$ 18.36 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × \$816.12 | = | \$ 16.32 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × \$816.12 | = | \$ 28.56 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × \$816.12 | = | \$ 53.05 |
| | | \$ 116.29 |

11/1/91 pay—\$843.22 (31/143 × \$3,890.17)

| | | |
|---|---|---|
| Interest from 11/1/91 to 12/31/91 @ 9% .09 × 2/12 × \$843.32 | = | \$ 12.65 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × \$843.32 | = | \$ 16.87 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × \$843.32 | = | \$ 29.52 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × \$843.32 | = | \$ 54.82 |
| | | \$ 113.86 |

12/1/91 pay—\$816.12 (30/143 × \$3,890.17)

| | | |
|---|---|---|
| Interest from 12/1/91 to 12/31/91 @ 9% .09 × 1/12 × \$816.12 | = | \$ 6.12 |
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × \$816.12 | = | \$ 16.32 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × \$816.12 | = | \$ 28.56 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × \$816.12 | = | \$ 53.05 |
| | | \$ 104.05 |

1/1/92 pay—\$843.32 (31/143 × \$3,890.17)

| | | |
|---|---|---|
| Interest from 1/1/92 to 3/31/92 @ 8% .08 × 3/12 × \$843.32 | = | \$ 16.87 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × \$843.32 | = | \$ 29.52 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × \$843.32 | = | \$ 54.82 |
| | | \$ 101.21 |

<u>1992</u>
(1)  Gross back pay

| | | |
|---|---|---|
| 1/1/92 to 6/30/92 @ \$17,265.15/year 1/2 × \$17,265 | = | \$ 8,632.58 |
| 7/1/92 to 12/31/92 @ \$17,783.10 1/2 × \$17,783.10 | = | \$ 8,891.55 |
| Christmas bonus | + | \$ 100.00 |
| | | \$17,624.13 |

(2)  Less other earnings      –      (\$10,714.30)

(3)  Net back pay due      =      \$ 6,909.83

(4)  Average monthly pay
    1/12 × \$6,909.83      =      \$   575.82

2/1/92—$575.82

| | | |
|---|---|---|
| Interest from 2/1/92 to 3/31/92 @ 8% .08 × 2/12 × $575.82 | = | $ 7.68 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $575.82 | = | $ 20.15 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 65.26 |

3/1/92—$575.82

| | | |
|---|---|---|
| Interest from 3/1/92 to 3/31/92 @ 8% .08 × 1/12 × $575.82 | = | $ 3.84 |
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $575.82 | = | $ 20.15 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 61.42 |

4/1/92—$575.82

| | | |
|---|---|---|
| Interest from 4/1/92 to 9/30/92 @ 7% .07 × 6/12 × $575.82 | = | $ 20.15 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 57.58 |

5/1/92—$575.82

| | | |
|---|---|---|
| Interest from 5/1/92 to 9/30/92 @ 7% .07 × 5/12 × $575.82 | = | $ 16.79 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 54.22 |

6/1/92—$575.82

| | | |
|---|---|---|
| Interest from 6/1/92 to 9/30/92 @ 7% .07 × 4/12 × $575.821 | = | $ 13.44 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 50.87 |

7/1/92—$575.82

| | | |
|---|---|---|
| Interest from 7/1/92 to 9/30/92 @ 7% .07 × 3/12 × $575.82 | = | $ 10.08 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 47.51 |

8/1/92—$575.82

| | | |
|---|---|---|
| Interest from 8/1/92 to 9/30/92 @ 7% .07 × 2/12 × $575.82 | = | $ 6.72 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 44.15 |

9/1/92—$575.82

| | | |
|---|---|---|
| Interest from 9/1/92 to 9/30/92 @ 7% .07 × 1/12 × $575.82 | = | $ 3.36 |
| Interest from 10/1/92 to 11/1/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |
| | | $ 40.79 |

10/1/92—$575.82

| | | |
|---|---|---|
| Interest from 10/1/92 to 10/31/93 @ 6% .06 × 13/12 × $575.82 | = | $ 37.43 |

11/1/92—$575.82

| | | |
|---|---|---|
| Interest from 11/1/92 to 11/1/93 @ 6% .06 × 12/12 × $575.82 | = | $ 34.55 |

12/1/92—$575.82

| | | |
|---|---|---|
| Interest from 12/1/92 to 11/1/93 @ 6% .06 × 11/12 × $575.82 | = | $ 31.67 |

1/1/93—$575.82

| | | |
|---|---|---|
| Interest from 1/1/93 to 11/1/93 @ 6% .06 × 10/12 × $575.82 | = | $ 28.79 |

1993

| | | |
|---|---|---|
| (1)  Gross back pay | | |
| 1/1/93 to 6/30/93 @ $17,783.10/year 1/2 × $17,783.10 | = | $ 8,891.55 |
| 7/1/93 to 10/31/93 @ $18,138.76 123/365 × $18,138.76 | = | $ 6,112.51 |
| | | $15,004.06 |
| (2)  Less other earnings | – | ($12,271.56) |
| (3)  Net back pay due | = | $ 2,732.50 |
| (4)  Average monthly pay | | |
| 1/9 × $2,732.50 | = | $ 303.61 |

2/1/93—$303.61

| | | |
|---|---|---|
| Interest from 2/1/93 to 10/31/93 @ 6% .06 × 9/12 × $303.61 | = | $ 13.66 |

3/1/93—$303.61

| | | |
|---|---|---|
| Interest from 3/1/93 to 10/31/93 @ 6% .06 × 8/12 × $303.61 | = | $ 12.14 |

4/1/93—$303.61

| | | |
|---|---|---|
| Interest from 4/1/93 to 10/31/93 @ 6% .06 × 7/12 × $303.61 | = | $ 10.63 |

5/1/93—$303.61

| | | |
|---|---|---|
| Interest from 5/1/93 to 10/31/93 @ 6% .06 × 6/12 × $303.61 | = | $ 9.11 |

6/1/93—$303.61
    Interest from 6/1/93 to 10/31/93 @ 6% .06 × 5/12 × $303.61     =    $    7.59
7/1/93—$303.61
    Interest from 7/1/93 to 10/31/93 @ 6% .06 × 4/12 × $303.61     =    $    6.07
8/1/93—$303.61
    Interest from 8/1/93 to 10/31/93 @ 6% .06 × 3/12 × $303.61     =    $    4.55
9/1/93—$303.61
    Interest from 9/1/93 to 10/31/93 @ 6% .06 × 2/12 × $303.61     =    $    3.04
10/1/93—$303.61
    Interest from 10/1/93 to 10/31/93 @ 6% .06 × 1/12 × $303.61     =    $    1.52
                            TOTAL:                              $ 1,143.65

B.   Prejudgment interest on total amount from 11/1/93 to 6/30/95
     11/1/93 to 6/30/94 @ 6% per annum .06 × 8/12 × $13,508.84     =    $    540.35
     7/1/94 to 9/30/94 @ 7% per annum .07 × 3/12 × $13,508.84     =    $    236.40
     10/1/94 to 3/31/95 @ 8% per annum .08 × 6/12 × $13,508.84     =    $    540.35
     4/1/95 to 6/30/95 @ 9% per annum .09 × 3/12 × $13,508.84     =    $    303.65
                                                     $ 1,621.05

C.   Total prejudgment interest                            $ 2,764.70

3.   Summary
     Net back pay                                  —    $13,508.84
     Prejudgment interest                        —    $ 2,764.70
     Net award                                     —    $16,273.54